1    OKEEFE & ASSOCIATES
2    LAW CORPORATION, P.C.
     Sean A. OKeefe. (State Bar No. 122417)
3    660 Newport Center Drive, Ste. 400
     Newport Beach, California 92660
4    Telephone:  949-720-4165
5    Facsimile:  949-720-4111
     Email: sokeefe@okeefelc.com
6

7    Attorneys for plaintiffs
8    Don Lowry and Erica Echols Lowry

9

10           **UNITED STATES DISTRICT COURT**
          **CENTRAL DISTRICT OF CALIFORNIA**
11            **Santa Ana Division**

12



13    DON LOWRY and ERICA ECHOLS
14    LOWRY,                Case No.    **CV08-02120 RGK (SSx)**

15         Plaintiffs,

16                    **COMPLAINT FOR: SECURITIES**
        v.                     **FRAUD; FRAUD; RESCISSION;**
17                        **BREACH OF CONTRACT; UNJUST**
18    TRUE COLORS INTERNATIONAL,    **ENRICHMENT; INTENTIONAL**
     INC., a Nevada corporation; TRUE     **INTERFERENCE WITH**
19    COLORS, INC., a California corporation,   **PROSPECTIVE ECONOMIC**
20    IAIN SAUL, MITCHELL MONDO,     **ADVANTAGE; SLANDER;**
     DOUGLAS MONDO, GREGORY       **INJUNCTIVE RELIEF; REQUEST**
21    MYERS and CANDICE CAMPBELL    **FOR JURY TRIAL**

22         Defendants.
23

24

25

26

27

28

Plaintiffs Don Lowry ("Don Lowry" or "Lowry") and Erica Echols Lowry ("Erica Lowry") (together the "Lowrys" or "Plaintiffs"), hereby allege as follows:

## JURISDICTION AND VENUE

1.     The claims hereunder are alleged pursuant to, <u>inter alia</u>, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b) and 78t(a)] and Rule 10b-5 promulgated by the SEC [17 C.F.R. 240.10b-5], Section 9 of the Exchange Act [15 U.S.C. § 78i(a)(1)]. This Court has jurisdiction over these claims pursuant to Section 27 of the Exchange Act of 1934 [15 U.S.C. § 78aa]. The defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce and/or of the mails in connection with the actions described in this Complaint.

2.     This Court has jurisdiction over the remaining claims alleged herein pursuant to 28 U.S.C. § 1367, on the grounds that such claims arise out of the same common nucleus of facts as the federal questions claims or they are integrally related thereto.

3.     Venue is proper under 28 U.S.C. §§ 1391 and 1400(a). Defendants True Colors, Inc., a Nevada corporation ("TCI"), and True Colors, Inc., a California corporation ("TCC"), have their headquarters locations in Orange County, California and are doing business in Orange County, California. Defendant Iain Saul has frequent contacts with Orange County and he is the Chairman of the Board of Directors and the President of TCC and TCI; defendant Gregory Myers works as a securities broker in Los Angeles, California; defendant Candice Campbell is an

officer and agent of TCC and TCI; defendants' Mitchell Mondo and Douglas Mondo are former officers of TCC and TCI; and all of the actions complained of herein were engaged in by the Defendants in Orange County, California.

## **ALLEGATIONS RE PARTIES**

4.    Plaintiff Don Lowry is a resident of Orange County, California.

5.    Plaintiff Erica Lowry is a resident of Orange County, California.

6.    Defendant True Colors International, Inc., is a Nevada corporation ("TCI"), doing business in Orange County, California.

7.    Defendant True Colors, Inc., is a California corporation ("TCC"), doing business in Orange County, California.

8.    Defendant Iain Saul ("Iain Saul" or "Saul"), is an Australian national, who is doing business in the State of California and is currently the President and Chairman of the Board of Directors of TCC and TCI.

9.    Defendant Mitchell Mondo is a resident of California, and a former officer and director of TCI.

10.    Defendant Douglas Mondo is a resident of California and a former officer and director of TCI.

11.    Defendant Candice Campbell is a resident of California, an officer of TCI and TCC, and a member of the Bar of California.

12.    Defendant Gregory Myers is a securities broker who works in Los Angeles, California.

## GENERAL ALLEGATIONS

### Securities Fraud, Fraud and Breach of Stock Purchase Agreement

13.     Don Lowry founded TCC in 1978 to develop, promote and license a personality assessment system and personal development program called "True Colors." The True Colors system was based upon past research, indicating that most people fell within one of four broad personality categories. The True Colors system developed by Lowry described these four categories and assigned a particular color to each personality category. Using this system as a foundation, Lowry developed a series of training programs, entertainment products and educational tools that enabled people to identify their personality "colors" and the personality "colors" of others. Through these programs, people can identify their individual strengths, weaknesses and propensities and then use this information to improve their lives.

14.     Thousands of businesses and educational institutions throughout the world now employ the True Colors system developed by Mr. Lowry to identify the particular characteristics and capacities of their employees or students, so these needs can be addressed and their capacities employed in the most mutually beneficial means possible. Lowry's True Colors program is also used by therapists throughout the world to facilitate personal growth, emotional reconciliation and gain psychological understanding for those in need.

15.     Don Lowry has also written a number of books on the subject of True Colors and has developed a series of plays, training regimens, work materials and

interactive skits to facilitate the process of indentifying personality traits, needs and capacities. These materials include the following (the "DL Authored Works"):

    a.  Don Lowry's True Colors Keys To Personal Success

    b.  Keys to Successful Teaching

    c.  Keys to Successful Leadership

    d.  Keys to Successful Business Leadership

    e.  Keys to Personal Success Facilitator's Kit

    f.  True Colors Flash Cards

    g.  True Colors Character Cards

    h.  True Colors Stickers

    i.  True Colors Parenting Cards

    j.  True Colors Spanish Cards

    k.  Keys To Successful Student Leadership

    l.  Flying Your True Colors For True Success (co-authorship with Erica Lowry)

    m. Follow Your True Colors To The Work You Love (co-authored with Carolyn Kalil).

    16.   Erica Lowry is Don Lowry's spouse. She is a distinguished author and has developed a number of theatrical programs, visuals and training tools that employ the True Colors system. The books and materials authored by Erica Lowry include (the "EL Authored Works"):

a)    Colorbot Book For Boys

b)    Colorbot Book for Girls

c)    Colorbot Book: Teacher's Guide

d)    Flying Your True Colors For True Success (co-authorship with Don Lowry)

e)    Flying Your True Colors For True Success Instructors Guide

f)    Flying Your True Colors: Foundations In Teaching

g)    True Colors Class Management and Lesson Planning

h)    Holiday Colors Participant Kit

i)    Holiday Colors Facilitator's Kit

17.    Prior to January 1, 2004, the Lowrys owned one hundred percent of the common stock and exercised exclusive executive control over TCC. During the time frame when they owned and operated TCC, the Lowrys assigned their copyrights to the DL Authored Works and the EL Authored Works to TCC (together the "Authored Works"), or they registered the copyrights for these works in the name of their company.

18.    In 2003, the Lowrys were approached by Mitchell and Douglas Mondo (the "Mondos"), two individuals who controlled a Nevada corporation called LBC Global, Inc. LBC Global has since changed its name to True Colors International, the defendant referred to herein as TCI.

19.    The Mondos and TCI offered to acquire all of the common stock of

6

TCC through TCI, and offered the Lowrys 750,000 shares in TCI, plus $150,000 in cash, and various contractual rights in return.

20.     The Mondos and TCI represented that the "True Colors" brand, trademarks and in fact all of the intellectual property owned by TCC would be jointly owned and shared by the Lowrys individually and TCC, subject to certain conditions. Accordingly, under this arrangement the Lowrys would be entitled to market and sell existing True Colors "content" independently, and to create, market and sell both existing and new content through any media means they desired, whether within or outside TCC and TCI.

21.     The Mondos and TCI represented to the Lowrys that the 750,000 shares of TCI they would receive under this acquisition transaction (the "Acquisition") would become "free trading" when TCI became a "publicly traded company." The Mondos and TCI further represented that TCI would become a "publicly traded company" within one year of the Acquisition and that the minimum stock price would not be less than $2.00 per share. This combination was intended to insure that the Lowrys received not less than $1.5 million for the TCI stock being issued to them under the contract.

22.     The foregoing representations by the Mondos and TCI were false. In fact the Mondos' and TCI never intended to honor these contractual obligations, but merely made these representations in order to obtain control of TCC from the Lowrys.

23.     Based upon the foregoing representations, which the Lowrys reasonably and justifiably relied upon, the Lowrys entered into the following series of contracts with TCI:

    A. Stock Purchase Agreement

    B. Joint Venture Agreement

    C. Gross Receipts Agreement

    D. Consulting Agreements

    E. Royalty Agreement

(collectively the "Buy-Out Contracts").

24.     Since the Lowrys were financially and legally unsophisticated and did not have a lawyer of their own to represent their interests in the Acquisition, the Mondos persuaded the Lowrys to use Candice Campbell to serve as their legal counsel.

25.     Prior to representing the Lowrys, Campbell had a preexisting relationship with Mondos or their companies and may have represented them as legal counsel.

26.     As counsel to the Lowrys, Campbell was required to represent the Lowrys' best interests exclusively, even if that conflicted with her prior allegiance to the Mondos.

27.     Instead of complying with her fiduciary charge, Campbell, unbeknownst to the Lowrys, worked to facilitate and promote the best interests of

the Mondos in the Acquisition and at all times thereafter.

28.     Attached hereto and incorporated herein by reference as Exhibit "1" is a true and correct copy of the *Stock Purchase Agreement* and the amendments to the same (the "Stock Purchase Agreement").

29.     Attached hereto and incorporated herein by reference as Exhibit "2" is a true and correct copy of the *Joint Venture Agreement* entered into by and between Don Lowry and TCI.

30.     Attached hereto and incorporated herein by reference as Exhibit "3" is a true and correct copy of the *Gross Receipts Agreement* entered into by and between Don Lowry and TCI.

31.     Attached hereto and incorporated herein by reference as Exhibit "4" is a true and correct copy of the *Consulting Agreement* entered into by and between Don Lowry and TCI.

32.     Attached hereto and incorporated herein by reference as Exhibit "5" is a true and correct copy of the *Consulting Agreement* entered into by and between Erica Lowry and TCI.

33.     Attached hereto and incorporated herein by reference as Exhibit "6" is a true and correct copy of the *Royalty Schedule* entered into by and between Don and Erica Lowry and TCI. The Royalty Schedule, along with the provisions in the Stock Purchase Agreement referencing the obligation to pay royalties to the Lowrys is referred to herein as the "Royalty Agreement."

34.     All of the Buy-Out Contracts were prepared by Campbell in her purported capacity as counsel to the Lowrys.

35.     After the Acquisition closed, the Mondos exercised executive control over TCC and TCI.

36.     Together the Stock Purchase Agreement and the Royalty Agreement reflect the intent of the parties relative to who would own and control the copyrights with respect to the Authored Works. In summary, the parties agreed that TCC and TCI could only use the Authored Works if TCC and TCI paid the Lowrys a royalty.

37.     Prior to the close of the Acquisition, the Mondos executed the Royalty Agreement. The schedule fixed the Lowry's royalty percentage as to some of the Authored Works, but left other percentages to be determined by the parties in good faith, post-closing.  Campbell persuaded the Lowrys to "trust" Mondos and accept this arrangement, because at all times her allegiance was to the Mondos and not to the Lowrys, notwithstanding the fact that the Lowrys were Campbell's client.

38.     After the Buy-Out Agreements were signed and the Acquisition closed, the Mondos caused TCC and TCI to sell the Authored Works, but refused to pay the royalties due the Lowrys.

39.     After the Acquisition, the Mondos hired Campbell as "general counsel" to TCC and TCI. Instead of working to enforce the rights of her clients under the Buy-Out Contracts, Campbell, in her capacity as general counsel to TCC, worked to

thwart the Lowrys rights under the very Buy-Out Contracts she had drafted while representing the Lowrys, notwithstanding the fact that Campbell was barred by Section 3-310(E) of California's Code of Professional Responsibility from engaging in this course of conduct.

40.    In 2006, Iain Saul ("Saul"), an Australian national, managed to wrest control of the board of directors from the Mondos, under conditions that are still not clear today.

41.    After gaining control over TCC and TCI, Saul continued the Mondos' and TCI's efforts to defraud the Lowrys and in fact he developed a scheme to employ the public securities markets as the means to achieving this end.

42.    Section 1.5.1 of the Stock Purchase Agreement states:

> Qualified Floor Provision. LBC shall provide a $1,500,000 qualified floor
> provision as described in Schedule 1.5.1. In addition, in the event that on
> or before December 31, 2005, LBC is not a *publicly traded company*,
> Owners may, at their sole election, rescind this entire transaction, and
> return the 750,000 shares of LBC and such portion of the Cash
> Consideration paid to Owners, and 100% of the issued and outstanding
> ownership interests of TCC shall be returned to Owners.

(See, Exhibit "1," Section 1.5.1) (italics added).

43.    Schedule 1.51 of the Stock Purchase Agreement that is referenced in the above quoted section provides:

1.51 Qualified Floor

The 750,000 shares to be issued to Owners will be guaranteed by LBC to have a market value of at least $2.00 per share, as measured by the 10-Day average trading price of the stock at a date that is one year from the Closing Date of this Agreement. At that time, should the value of the Shares be less than $2.00 per share, additional shares will be issued, utilizing the 10-day average trading price prior to the measurement date, such that the aggregate value of newly-issued shares plus the 750,000 original shares will be $1,500,000.

(See, Exhibit "1," Section 1.51).

44.    At the request of TCI and TCC, the Lowrys agreed, on three occasions, to extend the December 31, 2005 deadline in Section 1.5.1 of the Stock Purchase Agreement. Accordingly, the last date for performance was March 31, 2007.

45.    Recognizing that TCI and TCC could not legitimately become a "publicly traded company" by March 31, 2007, and that the market price for TCI stock was less than one half of the $2.00 price guaranteed in the Stock Purchase Agreement, Saul, working with Candice Campbell and Gregory Myers, a broker, knowingly and intentionally developed and implemented a fraudulent scheme.

46.    Saul, Campbell and Myers purported to "bring the company public" using SEC Rule 15c2-(11).  In furtherance of this scheme, Saul filed a materially false Form 211 wherein he failed to disclose the substantial obligations owed to the

Lowrys or the Lowrys' rescission rights under the Stock Purchase Agreement. This form also failed to disclose that TCI was insolvent and that the company had failed to pay hundreds of thousands of dollars in overdue obligations.

47.   After filing the Form 211, Saul, Campbell and Myers contacted one or more friendly third parties, and persuaded these parties to buy a small number of shares of TCI on the OTCBB at the $2.00 price level one or two days before the deadline in Section 1.5.1 of the Stock Purchase Agreement expired.

48.   Campbell not only worked with Saul and Myers to facilitate and implement this fraud, she was instrumental in closing the false trades, all in an effort to defraud her former clients of the rights granted to them under the contracts that Campbell drafted.

49.   Shortly after Myers orchestrated this fraud, at the behest and direction of Saul and Campbell, Myers admitted to the Lowrys that in fact he had orchestrated this trade at the artificial price of $2.00 "market" price with the help of a "a friend."

50.   When Saul, Campbell and Myers engaged in this knowing and fraudulent manipulation of the public securities market[1], they knew that the price being set by these "matched" trades was not even close to the "market" price of the stock. To the contrary, they knew that the market price was substantially less than

[1] Edward J. Mawod & Co., 46 S.E.C. 865, 870 n.24 (1977), aff'd sub nom., Mawod v. SEC, 591 F.2d 588 (10th Cir. 1979) ("Trading activity is a potent factor in evoking investor interest. That is why those who wish to stimulate such interest are tempted to create synthetic activity that entices investors into the marketplace by false pretenses."); See, SECURITIES EXCHANGE ACT OF 1934, Rel. No. 45691 / April 4, 2002, Admin. Proc. File No. 3-10288 ("Two traders at separate firms aided and abetted a market manipulation by effecting prearranged, matched trades").

the $2.00 for, <u>inter alia</u>, the following reasons:

A)    Saul had offered sell his own shares in TCI for half this price during the same period when he caused TCI to orchestrate a single "matched trade" using a known buyer and known seller, at the price of $2.00 per share. Saul has subsequently contacted Lowrys and offered to sell his shares to Lowry at sixty cents per share;

B)    TCI itself was offering to sell its stock to investors for less than half this price during the same period;

C)    Saul and Campbell knew that TCI and TCC lacked audited financials or in fact any accurate financials and it was insolvent at this point in time;

D)    Since TCC and TCI could not pay their obligations and were insolvent, Saul had the companies persuade the larger vendors to enter into short term forbearance agreements by threatening to file bankruptcy if they failed to do so. Yet Saul represented to the investment world and to the Lowrys that TCC and TCI were current with all of their financial obligations in the Form 211 he filed pursuant to Rule 15c2-(11)(a)(5), and;

E)    Saul and Campbell knew that TCI could not comply with the obligations owed to the Lowrys under the Stock Purchase Agreement and consequently that the stock they were purporting to "sell" was in

1 fact worth less than half of the $2.00 stock price.

2   51. When the Lowrys confronted Saul regarding TCI's failure to comply

3

4 with the "publicly traded company" requirement in Section 1.5.1 of the Stock

5 Purchase Agreement and the price floor in Section 1.5.1 of the Schedules to this

6 agreement, Saul falsely represented to the Lowrys that TCI was now a "public

7

8 company" by virtue of the above referenced "matched trades" he had arranged

9 several weeks earlier. Saul has also falsely represented to other shareholders that

10 TCI is now a "publicly traded  company," in order to keep up the ruse he perpetrated

11

12 to defraud the Lowrys.

13   52. Myers also represented to the Lowrys that TCI was a publicly traded

14 company as of the March 31, 2007 date by virtue of the fraudulent actions taken by

15

16 Saul, Campbell and Myers described herein.

17   53. When the Lowrys investigated Saul's representation that a) TCI was a

18 "public company" and b) trades had "averaged" $2.00 per share in arm length

19

20 transactions on a public market, they discovered that Saul's statements were false. In

21 fact, both the broker that made the trade and a director of the company have

22 acknowledged that these trades were "matched trades" orchestrated by Saul,

23

24 Campbell and Myers for one reason – to deny the Lowrys their contractual rights

25 under the Stock Purchase Agreement.

26

27

28   54. Since engaging in the foregoing fraud, Saul has tried to keep the

pretense of a $2.00 stock value, by purporting to "offer" for sale the stock of TCI, without a prospectus and without accurate financial information on record, for a $2.00 share price. However, during this same time, Saul has offered to sell his own shares at a price of sixty cents per shares and the Lowrys allege on information and belief that Saul, or a group he controls, secretly purchased a controlling block of shares from the Mondos for a purchase price of less than $1.00 per share.

55.    Recently, Saul admitted at a board of directors meeting that TCI had sold shares to unqualified investors. However, instead of endeavoring to correct this violation of the securities laws, Saul, along with the company's corporate counsel, Candice Campbell, indicated that they intended to ignore or bury this wrong.

## Tradename Infringement And Unfair Competition

56.    The Stock Purchase Agreement and Joint Venture Agreements executed by TCI and TCC acknowledge that Don Lowry was conducting business under the tradename "True Colors Studios" and that he intended to continue to conduct business in the future under this tradename.

57.    Under California law, tradenames are given the same protection as trademarks. *See H. Moffat Co. v. Koftinow*, 232 P.2d 15, 18 (Cal. App. 1951); *see also Nagle v. Sunshine Enterprises, Inc.*, 2005 WL 1206854 at 5-6 (Cal. App. 2005) (noting that ownership of a trademark does not belong to the party who registers it first, but to the party who first uses it in the sale of goods or services).

58.    In an intentional and malicious effort to infringe on Don Lowry's

tradename and to thwart his rights under the Buy-Out Contracts, Saul and Campbell formed a corporation under California law bearing the name True Colors Studios, Lowrys recognized and in fact acknowledged tradename.

59.    Saul and Campbell incorporated True Colors Studios in order to usurp and infringe upon Don Lowry's recognized tradename and to thwart his rights under the Buy-Out Contracts.

**Intentional Interference With Prospective Economic Advantage And Slander**

60.    The Stock Purchase Agreement provides that TCC and the Lowrys shared the True Colors brand after the Acquisition. The application provision in the Stock Purchase Agreement provides:

> 3.14.1 Mutual Use of True Colors Brand. TCC, post-closing, shall share the ownership of the True Colors brand (excluding the True Colors Classrunner mark, which is being transferred solely to ESI) with True Colors Studios. The True Colors brand shall include, but not be limited to, all trademarks, servicemarks and other intellectual property rights owned by TCC. TCC and True Colors Studios shall have simultaneous and equal rights to the True Colors brand in all markets worldwide. TCC will have exclusive rights (shared only with True Colors Studios) to the True Colors brand with regard to electronic commerce on the Internet. No third party can be

licensed the brand by True Colors Studios for use of the brand

with regard to electronic commerce on the Internet. True

Colors Studios will have the exclusive rights (shared only with

TCC) to the True Colors brand with regard to the

entertainment·industry. No third party can be licensed the

brand by TCC for use of the brand with regard to the

entertainment industry. With respect to the mutual use of the

True Colors brand, TCC and True Colors Studios agree that

they will maintain the quality control standards previously

established by TCC and that they agree to make whatever

remedial measures are reasonably requested by the other party

to maintain such quality control standards.

61.   Pursuant to Section 3.14.1 referenced above (the "Brand Sharing

Provision"), the Lowrys have the right to use, create, promote and independently sell

products using the True Colors brand, all related marks and intellectual property

after the Acquisition, subject only to the following internet related restriction:

TCC will have exclusive rights (shared only with True Colors

Studios) to the True Colors brand with regard to electronic commerce

on the Internet. No third party can be licensed the brand by True

Colors Studios for use of the brand with regard to electronic

commerce on the Internet.

1   (See, Exhibit "1").

2       62.     This limitation allows the Lowrys, whether acting under their own

3   name, or under the tradename True Colors Studios, *to directly market the brand or*

4

5   *branded products on the internet* or through any other media. However, they could

6   not license the brand to a third party with a provision allowing the third party

7

8   licensee to independently create, promote and sell True Colors products and services

9   via the internet.

10      63.     In 2006, Don and Erica Lowry created a new product (the "New

11  Product"). In 2007, the Lowrys were about to begin negotiations with a large

12

13  international company interested in acquiring or licensing the New Product.

14      64.     While the Lowrys were engaged in business discussions with the

15

16  broker facilitating this sale effort, Iain Saul learned of their pursuit of this

17  contractually allowed business opportunity. Saul then contacted the broker

18  negotiating the deal and threatened to file a lawsuit against him and the proposed

19

20  buyer/licensee for "millions." In this communication, Saul alleged that the New

21  Product violated TCC's trademark rights, when in fact he knew this statement was

22  false.

23

24      65.     Saul engaged in the foregoing intentional interference with prospective

25  contractual relations willfully and maliciously, with the intent of causing the Lowrys

26  financial damage and damaging the Lowrys' reputations among their peers in the

27

28  business community.

66.    As a result of Saul's willful and malicious conduct, the Lowrys have been damaged in an amount of not less than $1.0 million, with the exact sum to be established at trial.

### Slander and Defamation

67.    In early 2008, Saul solicited shareholder votes for board positions, with the intent of packing the board of directors with his supporters and cronies. In furtherance of this objective, Saul contacted a group of shareholders and represented to them that Don Lowry was attempting to take control of the board of directors, so he could secure his own appointment as President of TCC. Saul further represented that Lowry was incompetent and that if he became president of TCC, TCC would be driven into bankruptcy.

68.    Saul also represented to the employees that Don Lowry had plagiarized the content of the Authored Works and consequently was a fraud.

69.    In fact, Saul knew these statements (the "Slanderous Statements") were false when he made the same. His objective in communicating these false statements was to damage Lowrys' exceptional reputation in the True Colors community and in the business community generally. Saul's actions have damaged Don Lowry's reputation among the employees, customers and shareholders of TCC and TCI and in the local business community.

## Civil Extortion And Threats Against A Whistleblower

70.     In January of 2008, Saul attended a meeting of the board of directors, in his capacity as Chairman of the board of directors. In this meeting, Saul represented that a group affiliated with the Chinese Mafia was acquiring a controlling position and that this group, which Saul claims he had an affiliation, would engage in physical violence if Saul's position or prerogatives were interfered with by the other directors. Saul clearly made this statement and related statements in order to intimidate the other board members by threatening their physical safety, thereby impairing their ability to act as fiduciaries for TCI and TCC.

71.     Saul has also told the Lowrys that he would bankrupt TCC and TCI and drive the stock of TCI into the ground if they attempted to enforce their contractual rights or disputed Saul's manipulation of the company stock. Saul has also enforced his threats by cutting off Erica Lowry's consulting fee, by denying Don Lowry the wages promised to him in his capacity as a marketing director and sales executive.

## Breach of The Gross Receipts Agreement

72.     Concurrently with the execution of the Stock Purchase Agreement, TCC, TCI and Don Lowry entered into that certain Gross Receipts Agreement attached hereto as Exhibit "3."

73.     Pursuant to the terms of the Gross Receipts Agreement, TCC and TCI promised to pay Don Lowry one and one half percent (1.5%) of all "gross receipts" received by TCC from any source, less returns and investment income only. The

term gross receipts also included all receipts of any kind received by "affiliates" of TCC from sales of products or services relating to the "True Colors" brand. Such receipts were payable monthly.

74.   Starting in 2004, TCC and TCI, acting under the direction and control of Iain Saul, and with the cooperation and active participation of Campbell, failed and refused to pay the sums owed under the Gross Receipts Agreement.

75.   As of January 1, 2008, the Lowrys estimate that they are owed not less than one hundred and ten thousand dollars ($110,000) under the terms of the Gross Receipts Agreement, when interest is included as provided for under this agreement.

### Breach of Royalty Agreement

76.   Section 1.10 of the Stock Purchase Agreement included a provision that specifically acknowledged the Lowrys' authorship and individual ownership rights in the Authored Works. Since TCC and TCI desired to use some of these materials in the business, they agreed in Section 1.10, quoted below, to enter into a Royalty Agreement with the Lowrys allowing such use:

> 1.10  Royalty Agreement. After the Closing, TCC and Don shall negotiate a royalty agreement for the products developed by Don that are used by TCC. TCC and Don acknowledge that the negotiation of this agreement will probably not be concluded until TCC's financial situation is reviewed.

(See, Exhibit "1").

77.     After the Acquisition closed, TCC and TCI refused to pay any royalties to the Lowrys, but continued to sell the Authored Works in violation of the Lowrys' rights.

78.     As of December 31, 2007, not less than $250,000 was due and payable under the terms of the Royalty Agreement.

79.     Both Saul and Campbell have individually participated in this wrongdoing, with knowledge and with the intent to damage the Lowrys.

## Breach of Consulting Agreement – Erica Lowry

80.     The Consulting Agreement entered into by and between TCC and TCI provided that TCC and TCI would pay Erica Lowry the sum of $5,000 per month, from January 1, 2004 through March 31, 2008. This agreement further provided that TCC would pay the debt service on her car loan, and the insurance costs. In the aggregate, this payment totaled $5,870 per month.

81.     Starting in August of 2007, TCC and TCI  breached the terms of the Consulting Agreement with Erica Lowry by failing and refusing to pay the monthly payment due thereunder. TCC engaged in this course of conduct at the direction and insistence of Saul and based upon the legal advice of Campbell.

82.     As of February 1, 2008, the sum of $35,222 was due and owing under the terms of the Consulting Agreement with Erica Lowry.

### Breach of Joint Venture Agreement

83.     Pursuant to the terms of the Joint Venture Agreement, TCC and TCI agreed to sublease to Don Lowry, tradename "True Colors Studios," 1045 square feet of space within the building commonly known as 2825 Laguna Canyon Road, Laguna Beach, California. In August of 2006, TCC and TCI failed to pay the rent on the master lease on this space. As a result of this breach of the sublease, Lowry forfeited the sublease and the use of the space. As a result of this breach, Lowry has suffered not less than $200,000 in damages.

### Breach of Contract To Pay Business Expenses

84.     Pursuant to the terms of the Consulting Agreement between TCC and TCI on the one hand, and Lowry on the other, TCC and TCI agreed to pay the reasonable business expenses incurred by Lowry on TCC and TCI  business matters. Additionally, since June of 2007, Lowry has been employed by TCC and in this capacity has incurred substantial business expenses. TCC agreed to reimburse Lowry for these expenses before he incurred the same.

85.     As of January 1, 2008, Lowry incurred and was owed reimbursement for not less than $25,000 of business expenses by TCC and TCI. Although Lowry has requested that TCC pay these expenses as agreed, Iain Saul has directed TCC and TCI not pay these expenses without cause.

# FIRST CLAIM FOR RELIEF

## (Securities Fraud - Federal Law – Against TCI, Saul,

## Campbell and Myers)

86.     The Lowrys hereby reallege and reincorporate in this section the allegations set forth above.

87.     When the Lowrys entered into the Buy-Out Contracts they relied upon the representations made by TCI and the Mondos, and relied, in particular, upon the representation that TCI would become a publicly traded company and that the stock being issued to them would have a floor value of $2.00 per share.

88.     These representations were false and intended to perpetrate a fraud. TCI and the Mondos never intended to honor these obligations.

89.     Consistent with the initial fraud, when it came time for TCI to honor these obligations, TCI, acting at the direction and under the control of Iain Saul and Campbell, and with the participation and assistance of Myers, caused one or more shareholders of TCI to engage in "matched trades" on the OTCBB in order to create an artificial $2.00 per share stock price.[2]

90.     Thereafter Saul, Campbell, Myers and TCI represented to the Lowrys that TCI was a "publicly traded company" and that the $2.00 per share price required

---

[2] See, United States v. Russo, 74 F.3d 1383, 1391 (2d Cir. 1996) (holding trading scheme which "create[d] a false impression" of demand for the subject stock constituted market manipulation under Section 10(b) and Rule 10b-5); In re Lernout & Hauspie Sec. Litig., 236 F. Supp.2d at 173 (holding a person who employs a deceptive device as part of a fraudulent scheme may be primarily liable "even if a material misstatement by another person creates the nexus between the scheme and the securities market").

under the Stock Purchase Agreement had been achieved. In fact these representations were false and Saul, Campbell, Myers and TCI knew they were false when they made the same.

91.     Saul, Campbell, Myers and TCI engaged in the foregoing fraudulent scheme in order to deprive the Lowrys of their rights under the Stock Purchase Agreement.

92.     The foregoing actions were intentional, willful and malicious and the Lowrys have been damaged by the same.

93.     The Lowrys relied upon the representations made in the Stock Purchase Agreement and later they were initially forced by TCI, Saul, Campbell and Myers to accept and rely upon the false representations that TCI had become a publicly traded company and that its stock had traded at an average price of $2.00 per share on a public market.

94.     The Lowrys are entitled to a judgment against Saul for compensatory and punitive damages in amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### (Securities Fraud - California Law –Against TCI, Saul, Campbell, Myers and the Mondos)

95.     The Lowrys hereby reallege and  reincorporate in this section the allegations set forth above.

96.     When the Lowrys entered into the Buy-Out Contracts they relied upon

the representations made by TCI and the Mondos, and relied, in particular, upon the representation that TCI would become a publicly traded company and that the stock being issued to them would have a floor value of $2.00 per share.

97.     These representations were false and intended to perpetrate a fraud. TCI and the Mondos never intended to honor these obligations.

98.     Consistent with the initial fraud, when it came time for TCI to honor these obligations, TCI, acting at the direction and under the control of Iain Saul and with the active participation of Campbell and Myers, and in accordance with a scheme developed by Saul, caused one or more shareholders of TCI to engage in "matched trades" on the OTCBB in order to create an artificial $2.00 per share stock price.

99.     Thereafter Saul, Campbell, Myers and TCI then represented to the Lowrys that TCI was a "publicly traded company" and that the $2.00 per share price required under the Stock Purchase Agreement had been achieved. In fact these representations were false and Saul, Campbell, Myers and TCI knew that they were false when they made the same.

100.    Saul, Campbell, Myers and TCI engaged in the foregoing fraudulent scheme in order to deprive the Lowrys of their rights under the Stock Purchase Agreement.

101.    The foregoing actions were intentional, willful and malicious and the Lowrys have been damaged by the same.

102.   The Lowrys relied upon the representations made in the Stock Purchase Agreement and later they were initially forced by TCI, Saul, Campbell and Myers to accept and rely upon the false representations that TCI had become a publicly traded company and that its stock had traded at an average price of $2.00 per share on a public market.

103.   The Lowrys are entitled to a judgment against TCI, Saul, Campbell and Myers for compensatory and punitive damages in amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### (Fraud – Against TCI, Saul, the Mondos and Candice Campbell)

104.   The Lowrys hereby reallege and reincorporate in this section the allegations set forth above.

105.   The Mondos and TCI knowingly and intentionally defrauded the Lowrys by inducing them to enter into the Buy-Out Contracts without the intent of performing the obligations agreed upon therein.

106.   Saul, Campbell and TCI defrauded the Lowrys by falsely representing to the Lowrys and to the public generally that TCI was a public company as of March of 2007, and that TCI's shares traded at an average price of $2.00 per share on a public market.

107.   The Lowrys reasonably and justifiably relied upon these false representations.

108.   The Lowrys are entitled to a judgment against the Mondos, TCI, Saul

1   and Campbell for compensatory and punitive damages in amount to be proven at
2   trial.

### FOURTH CLAIM FOR RELIEF

### (Rescission – Against TCI)

109.   The Lowrys hereby reallege and reincorporate in this section the allegations set forth above.

110.   The Stock Purchase Agreement is a valid and binding agreement under the law of California.

111.   TCI failed to become a "publicly traded company" as provided in Section 1.5.1 of the Stock Purchase Agreement by March 31, 2007, and TCI stock has never "traded" in legitimate trades at an average per share price of $2.00 per share.

112.   Pursuant to Section 1.5.1, the Lowrys have the right to rescind the Stock Purchase Agreement and to recover 100% ownership of TCC upon the failure of these conditions.

113.   Accordingly, they are entitled to a return of their ownership interests in TCC and in return for their interests in TCI, which are hereby tendered back in accordance with the above provision.

## FIFTH CLAIM FOR RELIEF

### (Breach of Contract: Stock Purchase Agreement – Against TCI)

114.    The Lowrys hereby reallege and reincorporate in this section the allegations set forth above.

115.    The Stock Purchase Agreement is a valid and binding agreement under the law of California.

116.    TCI failed to become a "publicly traded company" as provided in Section 1.5.1 of the Stock Purchase Agreement by March 31, 2007, and TCI stock has never "traded" in legitimate trades at an average per share price of $2.00 per share.

117.    Pursuant to Section 1.5.1, the Lowrys have the right to rescind the Stock Purchase Agreement and to recover 100% ownership of TCC upon the failure of these conditions.

118.    Accordingly, the Lowrys are entitled to a return of their ownership interests in TCC or to a damage award in lieu of such rescission.

## SIXTH CLAIM FOR RELIEF

### (Unjust Enrichment – Against TCI)

119.    The Lowrys hereby reallege and reincorporate in this section the allegations set forth above.

120.    TCI represented to the Lowrys that they would receive $1.5 million of value from the stock of TCI within two years of the Acquisition. This promise

1   represented more than eighty percent of the consideration payable for TCC.

2   121.   The above representation was false, yet TCI used this fraud to acquire
3
4   ownership and control of the Lowrys' common stock in TCC.

5   122.   The Lowrys have been unjustly and fraudulently deprived of the value
6   they bargained for in the Stock Purchase Agreement and yet TCI received the full
7
8   consideration they bargained for.

9   123.   The Lowrys are entitled to an equitable ruling restoring to them the
10  benefit of the bargain they were promised.

11
12  ### SEVENTH CLAIM FOR RELIEF
13
    ### (Civil Conspiracy – Against TCI, Saul, Campbell and Myers)

14  124.   The Lowrys hereby reallege and reincorporate in this section the
15
16  allegations set forth above.

17  125.   Saul, Campbell, Myers and TCI designed and implemented the
18
19  fraudulent scheme described in the First and Second Claims for Relief. Accordingly,
20  Saul, Campbell and Myers should be held jointly and severably liable for all

21  judgments obtained against TCI arising from or relating to this wrongful conduct,
22
23  and TCI should be jointly and severally liable for all judgments obtained against
24  Saul, Myers and Campbell arising from or relating to this wrongful conduct.

25

26

27

28

# EIGHTH CLAIM FOR RELIEF

## (Tradename Infringement – Against TCC, TCI, Saul and Campbell)

126.   The Lowrys hereby reallege and reincorporate in this section the allegations set forth above.

127.   TCC, TCI, Saul and Campbell all knew that Don Lowry had been using the tradename True Colors Studios since at least 2002 and that he intended to continue to use this valuable and well recognized name in the future.

128.   TCC, TCI, Saul and Campbell attempted to steal this name from Lowry, by incorporating a shell corporation using the name "True Colors Studios."

129.   This act was taken to confuse the public and in particular customers and business affiliates of Don Lowry and to damage the value that he had developed in this recognized tradename.

130.   TCC, TCI, Saul and Campbell engaged in this course of conduct, willfully and with malice.

131.   The Lowrys are entitled to a judgment against TCC, TCI, Saul and Campbell, for both compensatory and punitive damages in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF

### (Intentional Interference With Prospective Economic Advantage –

### Against Saul)

132.   The Lowrys hereby reallege and reincorporate in this section the allegations set forth above.

133.   When Iain Saul and TCI contacted the broker to whom the Lowrys were in the process of selling the New Product, he knew that the Lowrys were fully empowered to engage in this course of conduct under the Stock Purchase Agreement.

134.   Saul also knew that the Lowrys had developed the product under the shared tradename provision in the Stock Purchase Agreement, that they were the sole owners thereof and that TCI had no rights in the same.

135.   Saul's statements to the broker were intended to thwart the Lowrys' sale of the New Product.

136.   As a result of Saul's and TCI's false and malicious statements to the broker, the prospect interested in acquiring the New Product declined to proceed with the negotiations.

137.   The Lowrys are entitled to a judgment against Saul and TCI for both compensatory and punitive damages in an amount not less than $1.0 million with the exact amount to be determined at trial.

## TENTH CLAIM FOR RELIEF

### (Slander and Defamation –Against Iain Saul)

138.   The Lowrys hereby reallege and reincorporate in this section the allegations set forth above.

139.   The Slanderous Statements made by Iain Saul to the shareholders and employees of TCC about Don Lowry were false and made with malice.

140.   The Slanderous Statements made by Saul damaged Lowry's business reputation and his standing in the business community, causing him damage and emotional distress.

141.   Lowry is entitled to a judgment against Saul in an amount to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF

### (Breach of Contract: Gross Receipts –Against TCC and TCI)

142.   The Lowrys hereby reallege and reincorporate in this section the allegations set forth above.

143.   Pursuant to the terms of the Gross Receipts Agreement, TCC and TCI were required to pay the Lowrys a fee of one and one-half percent (1.5%) of the gross receipts of TCC, less returns and any interest or investment income, monthly.

144.   The Gross Receipts Agreement is a valid and binding contract.

145.   The Lowrys are owed not less than one hundred and ten thousand dollars ($110,000) under the terms of the Gross Receipts Agreement.

146.   TCC and TCI have breached the terms of this contract by failing and refusing to pay this sum.

147.   The Lowrys are entitled to a judgment against TCC and TCI in an amount not less than one hundred and ten thousand dollars ($110,000).

## TWELFTH CLAIM FOR RELIEF

### (Breach of Contract: Royalty Agreement – Against TCC and TCI)

148.   The Lowrys hereby reallege and reincorporate in this section the allegations set forth above.

149.   The Royalty Agreement is a valid and binding contract.

150.   The Lowrys' are owed in excess of $300,000 in royalties under the Royalty Agreement.

151.   TCC and TCI have breached the terms of this contract by failing and refusing to pay this sum.

152.   The Lowrys are entitled to a judgment against TCC and TCI in an amount not less than $300,000.

## THIRTEENTH CLAIM FOR RELIEF

### (Breach of Contract: Consulting Agreement – Against TCC and TCI)

153.   The Lowrys hereby reallege and reincorporate in this section the allegations set forth above.

154.   The Consulting Agreement between Erica Lowry and TCC is a binding and enforceable agreement.

155.   Erica Lowry has fully performed all obligations due under the terms of the Consulting Agreement.

156.   TCC and TCI have breached the terms of the Consulting Agreement by failing and refusing to pay the sums due Erica Lowry thereunder.

157.   Erica Lowry is entitled to a judgment against TCC and TCI in the amount of not less than $60,000.

## FOURTEENTH CLAIM FOR RELIEF

### (Breach of Contract: Joint Venture Agreement – Against TCC and TCI)

158.   The Lowrys hereby reallege and reincorporate in this section the allegations set forth above.

159.   The Joint Venture Agreement is a valid and binding contract.

160.   The Lowrys' have performed their obligations under the Joint Venture Agreement.

161.   TCC and TCI have breached the Joint Venture Agreement by, inter alia, failing to pay the obligations provided for therein, and failing to maintain the tenancy necessary to preserve the sublease with the Lowrys.

162.   The Lowrys are entitled to a judgment for damages against TCC and TCI in amount not less than $200,000.

## FIFTEENTH CLAIM FOR RELIEF

### (Injunctive Relief – Against TCC, TCI, Saul and Campbell)

163.   The Lowrys hereby reallege and reincorporate in this section the allegations set forth above.

164.   If TCC and TCI had complied with the terms of the Stock Purchase Agreement, the Lowrys would own all of the common stock of TCC or would be the majority shareholders.

165.   TCC and TCI, acting under unlawful direction and control of Iain Saul and Candice Campbell, have deprived the Lowrys of the control that they are entitled to under the Stock Purchase Agreement and California law.

166.   Iain Saul and Campbell are exercising corporate control over TCC and TCI unlawfully in derogation of the Lowrys' rights.

167.   Iain Saul and Campbell are engaging in a course of conduct that is irreparably damaging TCC and the Lowry' ownership rights.

168.   TCC and TCI, acting under unlawful direction and control of Iain Saul and Candice Campbell are violating the Lowrys copyrights, degrading their tradename True Colors Studios and damaging the True Colors' brands and marks, which the Lowrys share.

169.   TCC and TCI, acting under unlawful direction and control of Iain Saul and Candice Campbell, are engaging in securities fraud under the Securities Act of 1933, the Securities And Exchange Act of 1934 and under the laws of California.

170.   The foregoing actions are irreparably harming the Lowrys, TCC and TCI.

171.   In order to protect their copyrights, preserve the value of True Colors brands and marks and to preserve any remaining value in TCC and TCI, immediate injunctive relief is necessary. Specifically Iain Saul and Candice Campbell must be removed from any executive or board position at TCC and TCI, TCC and TCI must be enjoined from selling any of the Authored Works, and a receiver must be appointed to take control of these entities pending a determination by the Court on the issue of corporate ownership.

## PRAYERS FOR RELIEF

WHEREFORE, the Plaintiff prays for the entry of a judgment granting the following relief:

### First Claim For Relief

A judgment for compensatory and punitive damages with the exact amount to be determined based upon the evidence adduced at trial.

### Second Claim For Relief

A judgment for compensatory and punitive damages with the exact amount to be determined based upon the evidence adduced at trial.

### Third Claim For Relief

A judgment for compensatory and punitive damages with the exact amount to be determined based upon the evidence adduced at trial.

### Fourth Claim For Relief

A judgment rescinding the Stock Purchase Agreement and returning to the Lowrys one hundred percent of the common stock of TCC.

### Fifth Claim For Relief

A judgment for compensatory and punitive damages with the exact amount to be determined based upon the evidence adduced at trial.

### Sixth Claim For Relief

A judgment for compensatory and punitive damages with the exact amount to be determined based upon the evidence adduced at trial.

### Seventh Claim For Relief

A judgment finding that Iain Saul, Candice Campbell and TCI are jointly and severally liable, as co-conspirators, for the judgments granted on the basis of the First, Second, Third, Fourth, Fifth and Sixth Claims for Relief.

### Ninth Claim For Relief

A judgment for compensatory and punitive damages with the exact amount to be determined based upon the evidence adduced at trial.

### Tenth Claim For Relief

A judgment for compensatory and punitive damages with the exact amount to be determined based upon the evidence adduced at trial.

### Eleventh Claim For Relief

A judgment for compensatory and punitive damages with the exact amount to be determined based upon the evidence adduced at trial.

### Twelfth Claim For Relief

A judgment for compensatory and punitive damages with the exact amount to be determined based upon the evidence adduced at trial.

### Thirteenth Claim For Relief

A judgment for compensatory and punitive damages with the exact amount to be determined based upon the evidence adduced at trial.

### Fourteenth Claim for Relief

A judgment for compensatory and punitive damages with the exact amount to be determined based upon the evidence adduced at trial.

### Fifteenth Claim For Relief

A order granting an injunction removing Iain Saul and Candice Campbell from all executive positions within TCC and TCI, enjoining TCC and TCI from violating the Lowrys' copyrights, enjoining TCC and TCI from selling securities, enjoining TCC, TCI, Saul and Campbell from violating Lowry tradename "True Colors Studios," enjoining TCC, TCI and Saul from interfering with the Lowrys use of the True Colors tradenames and marks, and granting such further relief as the Court deems just and proper.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## All Claims For Relief

An award of fees and costs and such further relief as the Court deems just and proper.

## Request For Jury Trial

The Plaintiffs hereby request a jury trial on all claims.

DATED:  March 31, 2008

OKEEFE & ASSOCIATES
LAW CORPORATION, P.C.

By: _____
Sean A. OKeefe, attorneys for
plaintiffs, Don Lowry and
Erica Echols Lowry

41

**EXHIBIT 1**

# STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (the "Agreement") effective January 1, 2004, is by and between LBC Global, Inc. ("Buyer", "LBC", or "LBC Global"), a Nevada corporation; True Colors, Inc., a California corporation, dba True Colors Communications ("Seller" or "TCC"); and Don Lowry ("Don") and Erica Echols Lowry ("Erica"), the shareholders of TCC (collectively, "Owners").

## RECITALS:

A.     LBC desires to acquire 100% of the ownership interests of TCC (the "TCC Shares") in exchange for 750,000 shares of the common stock of LBC Global, Inc, a Nevada corporation (the "LBC Shares") and $150,000 in cash.

B.     It is the intention of the parties hereto that: (i) LBC shall acquire 100% of the issued and outstanding ownership interests of TCC in exchange for 750,000 shares of LBC Global, Inc. and $150,000 in cash payable as set forth below (the "Exchange"); and (ii) the Exchange shall qualify as a transaction in securities exempt from registration or qualification under the Securities Act of 1933, as amended, and under the applicable securities laws of Nevada.

C.     The Board of Directors of LBC deems it to be in its best interest to acquire 100% of the issued and outstanding interests of TCC.

D.     The Owners of TCC deem it to be in their best interest to sell 100% of the issued and outstanding ownership interests of TCC for 750,000 shares of LBC Global, Inc., $150,000 in cash, and such other things as provided herein.

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties contained in this Agreement, the parties hereto agree as follows:

## SECTION 1. EXCHANGE OF SHARES AND CASH

1.1     _Acquisition of Shares._ The Owners agree that they shall, on the Closing Date (effective January 1, 2004), transfer all of their TCC Shares such that, after transfer of these TCC Shares, LBC will own 100% of the issued and outstanding ownership interests of TCC for a total of 750,000 shares of LBC Global, Inc. (valued at $2.00 per share) and $150,000 in cash (the "Cash Consideration"). The Cash Consideration shall be payable as follows:  Fifty Thousand Dollars ($50,000) on the Closing Date and the remainder in twelve (12) equal monthly payments of Eight Thousand Three Hundred Thirty-Three Dollars and Thirty-Three Cents ($8,333.33) commencing on May 1, 2004.

1.2     _Delivery of Shares._ On the Closing Date, the Owners will tender 100% of the issued and outstanding ownership interests of TCC for 750,000 shares of LBC Global and

will deliver to LBC the pertinent documents representing these interests, duly endorsed (or with executed stock powers) so as to make LBC the sole owner thereof. On the Closing Date, LBC will deliver to the Owners of TCC, certificates representing 750,000 shares of LBC Global, Inc.

1.3     Acknowledgment of Debt. LBC acknowledges a debt due by TCC to Educational Systems International ("ESI") in the amount of $400,000 (the "ESI Debt"). On the Closing Date, LBC will issue an additional 200,000 shares of common stock to ESI in total satisfaction of the ESI Debt.

1.4     Restricted Securities. The LBC Shares have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), and may not be resold unless the resale thereof is registered under the Securities Act or an exemption from such registration is available. Each certificate representing the LBC Shares will have a legend thereon in substantially the following form:

> The Shares represented by the certificate have not been registered under the Securities Act of 1933, as amended (the "Act"). The shares have been acquired for investment and may not be sold or transferred in the absence of an effective Registration Statement for the resale of the shares under the Act unless in the opinion of counsel satisfactory to the Company, registration is not required under the Act.

1.5.1     Qualified Floor Provision. LBC shall provide a $1,500,000 qualified floor provision as described in Schedule 1.5.1. In addition, in the event that on or before December 31, 2005, LBC is not a publicly traded company, Owners may, at their sole election, rescind this entire transaction, and return the 750,000 shares of LBC and such portion of the Cash Consideration paid to Owners, and 100% of the issued and outstanding ownership interests of TCC shall be returned to Owners.

1.5.2     Cash Payment Remedy. If LBC fails to pay any portion of the Cash Consideration on or before April 30, 2005, Owners may, at their sole election, rescind this entire transaction, and return the 750,000 shares to LBC and such portion of the Cash Consideration paid to Owners, and 100% of the issued and outstanding ownership interests of TCC shall be returned to Owners.

1.6     Consulting Agreements. On the Closing Date, Don and Erica shall execute Consulting Agreements, attached hereto as Exhibits B and C and incorporated herein by reference (the "Consulting Agreements"). During the term of the Consulting Agreements, Don and Erica shall remain on the Board of Directors of TCC and will agree to the appointment of Mitch Mondo and Deron Whitney as new TCC Board members. In the event that during the earlier of (a) the first twenty-one (21) months of the Consulting Agreements and (b) when LBC becomes a publicly traded company, any of the compensation provided in the Consulting Agreements is not paid as provided, Don and Erica may, at their sole election, rescind the entire transaction, and return the 750,000

shares of LBC and such portion of the Cash Consideration paid to Owners, and 100% of the issued and outstanding ownership interests of TCC shall be returned to Owners.

1.7     Joint Venture Agreements. On the Closing Date, TCC shall execute a joint venture agreement with Don Lowry, doing business as True Colors Studios, attached hereto as Exhibit A and incorporated herein by reference, and TCC shall execute a joint venture agreement with ESI, attached hereto as Exhibit D and incorporated herein by reference (collectively, the "Joint Venture Agreements").

1.8     Gross Receipts Agreement.   On the Closing Date, TCC shall execute a gross receipts agreement with Don, attached hereto as Exhibit E and incorporated herein by reference (the "Gross Receipts Agreement").

1.9     Furniture and Equipment.   On or before the Closing Date, Owners and Buyer shall inventory the furniture and equipment located at 2825 Laguna Canyon Road, Laguna Beach, California (the "Furniture and Equipment") and determine which Furniture and Equipment is to be the property of TCC after the Closing.

1.10    Royalty Agreement.   After the Closing, TCC and Don shall negotiate a royalty agreement for the products developed by Don that are used by TCC.  TCC and Don acknowledge that the negotiation of this agreement will probably not be concluded until TCC's financial situation is reviewed.

1.11    Automobiles. The parties understand that as of the Closing there should not be any automobiles owned by TCC and that to the extent an automobile was previously listed as an asset TCC it was in error.

## SECTION 2. REPRESENTATIONS AND WARRANTIES OF LBC GLOBAL

LBC Global, Inc. hereby represents and warrants as follows:

2.1     Organization and Good Standing. LBC Global, Inc. is a corporation, duly organized, validly existing and in good standing under the laws of Nevada. The Company has the corporate power and authority to carry on its business as presently conducted, and is qualified to do business in all jurisdictions where the failure to be so qualified would have a material adverse effect on its business.

2.2     Corporate Authority. LBC has the power to operate as a corporation and to perform any corporate obligations hereunder. The consummation of the transaction contemplated hereby is not in violation of any State, Governmental or corporate restrictions governing these transactions. The execution and performance of this Agreement will not constitute a material breach of any agreement, indenture, mortgage, license or other instrument or document to which LBC is a party and will not violate any judgment, decree, order, writ, rule, statute, or regulation applicable to LBC or its

properties. The execution and performance of this Agreement will not violate or conflict with any provision of the laws of the state of Nevada.

   2.3   Receipt of Corporate Information; Independent Investigation; Access. All requested documents, records and books pertaining to LBC and LBC Shares will be delivered to TCC as requested. All of TCC's questions and requests for information will be answered to TCC's satisfaction. Owners acknowledge that they, in making the decision to buy the LBC Shares in exchange for the TCC Shares, will rely upon independent investigations made by them or their representatives, if any, and they will have, prior to the Closing Date, been given access to and the opportunity to examine all material contracts and documents relating to this transaction and an opportunity to ask questions of, and to receive information from, LBC or any person acting on its behalf concerning the terms and conditions of this Agreement.

   2.4   Approvals. No approval, authorization, consent, order or other action of, or filing with, any person, firm or corporation or any court, administrative agency or other governmental authority is required in connection with the execution and delivery of this Agreement by LBC for the consummation of the transactions described herein, other than as set forth on Schedule 2.4.

   2.5   Financial Statements, Books and Records. Attached as Schedule 2.5 are the financial statements (balance sheet, income statement, notes) of LBC, through December 31, 2002 (the "Financial Statements"). The books of account and other financial records of LBC are in all respects complete and correct in all material respects and are maintained in accordance with good business and accounting practices

   2.6   No Material Adverse Changes. Since December 31, 2002 there has not been:

            (i)    any material adverse change in the financial position of the LBC, except changes arising in the ordinary course of business, which changes will in no event materially and adversely affect the financial position of any one of the companies;

            (ii)   any damage, destruction or loss materially affecting the assets, prospective business, operations or condition (financial or otherwise) of the companies, whether or not covered by insurance;

            (iii)  any declaration, setting aside or payment of any dividend or distribution with respect to any redemption or repurchase of capital interests with respect to each of the companies;

            (iv)   any sale of an asset (other than in the ordinary course of business) or any mortgage or pledge by LBC of any properties or assets belonging to the company; or

(v)    adoption of any pension, profit sharing, retirement, stock bonus, stock option or similar plan or arrangement.

2.7    <u>Taxes.</u> LBC has filed all material tax, governmental and/or related forms and reports (or extensions thereof) due or required to be filed and has paid or made adequate provisions for all taxes or assessments which had become due as of the Closing Date, and there are no deficiency notices outstanding. No extensions of time for the assessment of deficiencies for any year is in effect. No deficiency notice is proposed or, threatened against LBC. The tax returns have never been audited.

2.8    <u>Compliance with Laws.</u> LBC has complied with all federal, state, county and local laws, ordinances, regulations, inspections, orders, judgments, injunctions, awards or decrees applicable to it or its business which, if not complied with, would materially and adversely affect the business of LBC.

2.9    <u>No Breach.</u> The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not:

(i) violate any provision of the Articles of Incorporation or the Bylaws of LBC;

(ii) violate, conflict with or result in the breach of any of the terms of, result in a material modification of, otherwise give any other contracting party the right to terminate, or constitute (or with notice or lapse of time, or both constitute) a default under any contract or other agreement to which LBC is a party or by or to which it or any of its assets or properties may be bound or subject;

(iii) violate any order, judgment, injunction, award or decree of any court, arbitrator or governmental or regulatory body against, or binding upon, LBC or upon the properties or business of LBC; or

(iv)    violate any statute, law or regulation of any jurisdiction applicable to the transactions contemplated herein which could have a material, adverse effect on the business or operations of LBC.

2.10    <u>Actions and Proceedings.</u> LBC is not a party to any material pending litigation or, to the knowledge of LBC, after reasonable inquiry, any governmental investigation or proceeding not reflected in the Financial Statements and, no material litigation, claims, assessments or non-governmental proceedings are threatened against LBC except as set forth on Schedule 2.10 attached hereto and made a part hereof.

2.11    <u>Agreements.</u> Schedule 2.11 sets forth any material contract or arrangement to which LBC is a party or by or to which it or its assets, properties or business are bound or subject, whether written or oral.

2.12   <u>Brokers or Finders.</u> LBC will be solely responsible to pay the 10% broker's fee to Encovid, Inc. after closing in connection with the transactions contemplated by this Agreement. There are no other broker's or finder's fees payable by LBC in connection with the transactions contemplated by this Agreement.

2.13   <u>Real Estate.</u> Except as set forth on Schedule 2.13, LBC owns no other real property nor is a party to any leasehold agreement. All uses of the real property by LBC conform in all material respects to all applicable building and zoning ordinances, laws and regulations.

LBC has been issued all required federal, state and local licenses, certificates or permits relating to all applicable environmental laws. There are no visible signs of releases, spills, discharges, leaks or disposal (collectively, referred to as "Releases") of hazardous substances at, upon, under or within the real property owned by LBC.

2.14   <u>Tangible Assets.</u> LBC, prior to Closing, has full title and interest in all machinery, equipment, furniture, leasehold improvements, fixtures, projects, owned or leased by LBC, and to any related capitalized items or other tangible property material to the business of the company (the "Tangible Assets"). Other than as set forth in Schedule 2.14, LBC holds all rights, title and interest in all the Tangible Assets owned by it on the Balance Sheet or acquired by it after the date on the Balance Sheet free and clear of all liens, pledges, mortgages, security interests, conditional sales contracts or any other encumbrances. All of the Tangible Assets are in good operating condition and repair and are usable in the ordinary course of business and conform to all applicable laws, ordinances and government orders, rules and regulations relating to their construction and operation, except as set forth on Schedule 2.14 hereto. LBC has clear title to all of its fictional business names, trading names, registered and unregistered trademarks, service marks and applications (collectively, the "Marks") and the Marks are included as Tangible Assets.

2.15   <u>Liabilities.</u> LBC has no material direct or indirect indebtedness, liability, claim, loss, damage, deficiency, obligation or responsibility, known or unknown, fixed or unfixed, liquidated or unliquidated, secured or unsecured, accrued or absolute, contingent or otherwise, including, without limitation, any liability on account of taxes, any governmental charge or lawsuit (all of the foregoing collectively defined to as "Liabilities"), which are not fully, fairly and adequately reflected on the Financial Statements (annual and interim), except for any specific Liabilities set forth on Schedule 2.15 attached hereto and made a part hereof. As of the date of Closing, there will be no Liabilities, other than Liabilities fully and adequately reflected on the Financial Statements except for Liabilities incurred in the ordinary course of business and as set forth in Schedule 2.15.

2.16   <u>Access to Records.</u> The corporate financial records, minute books and other documents and records of LBC have been made available to TCC prior to the Closing of this transaction.

2.17   <u>Operations of the Company.</u> From the date of the Financial Statements through the date of Closing, LBC has not and will not, outside of the ordinary course of business, have:

(i)      incurred any indebtedness or borrowed money that is or will be charged against the company;

(ii)     declared or paid any dividend or declared or made any distribution of any kind, or made any direct or indirect redemption, retirement, purchase or other acquisition of any interests in its capital structure;

(iii)    made any loan or advance from LBC, or any officer, director, employee, consultant, agent or other representative or made any other loan or advance;

(iv)    disposed of any assets of the company;

(v)     materially increased the annual level of compensation of any executive employee of the company;

(vi)    increased, terminated, amended or otherwise modified any plan for the benefit of employees of the company;

(vii)   issued any equity securities or rights to acquire such equity securities with respect to the company; or

(viii)  entered into or modified any contract, agreement or transaction concerning the company.

2.18   <u>Capitalization.</u> The authorized capital of LBC is: 10,000,000 shares of stock, comprised of common shares, having a par value of $0.001 per share, and no preferred shares. As of January 1, 2004, there are 2,787,000 shares of LBC stock issued and outstanding and 7,213,000 shares of LBC stock authorized but not issued and outstanding.   There are no warrants, options, subscription rights nor any other commitments of any character relating to the issued or unissued shares of capital stock of the company.

2.19   <u>Full Disclosure.</u> No representation or warranty by LBC or in any document or schedule to be delivered by it pursuant to this agreement, and no written statement, certificate or instrument furnished or to be furnished by LBC in connection with the negotiation, execution or performance of this Agreement contains or will contain any untrue statement of a material fact or omits or will omit to state any fact necessary to

make any statement herein or therein not materially misleading or necessary to a complete and correct presentation of all material aspects of the business of LBC.

2.20  Ownership of Subsidiary.  LBC Global owns 100% of LBC Training and Education, Inc., which will be the direct owner of the 100% interest in TCC.

## SECTION 3. REPRESENTATIONS AND WARRANTIES OF TCC

TCC hereby represents and warrants as follows:

3.1  Organization and Good Standing. TCC is a corporation, duly organized, validly existing and in good standing under the laws of California. The Company has the corporate power and authority to carry on its business as presently conducted, and is qualified to do business in all jurisdictions where the failure to be so qualified would have a material adverse effect on its business.

3.2  Corporate Authority. TCC has the power to operate as a corporation and to perform any corporate obligations hereunder. The consummation of the transaction contemplated hereby is not in violation of any State, Governmental or corporate restrictions governing these transactions. The execution and performance of this Agreement, ultimately effecting a change in control of TCC, will not constitute a material breach of any agreement, indenture, mortgage, license or other instrument or document to which TCC is a party and will not violate any judgment, decree, order, writ, rule, statute, or regulation applicable to TCC or its properties. The execution and performance of this Agreement will not violate or conflict with any provision of the laws of the state of California.

3.3  Receipt of Corporate Information; Independent Investigation; Access. All requested documents, records and books pertaining to TCC will be delivered to LBC as requested. All of LBC's questions and requests for information will be answered to LBC's satisfaction. LBC acknowledges that they, in making the decision to buy the TCC Shares in exchange for the LBC Shares, will rely upon independent investigations made by them or their representatives, if any, and they will have, prior to the Closing Date, been given access to and the opportunity to examine all material contracts and documents relating to this transaction and an opportunity to ask questions of, and to receive information from, TCC or any person acting on its behalf concerning the terms and conditions of this Agreement.

3.4  Approvals. No approval, authorization, consent, order or other action of, or filing with, any person, firm or corporation or any court, administrative agency or other governmental authority is required in connection with the execution and delivery of this Agreement by TCC for the consummation of the transactions described herein, other than as set forth on Schedule 3.4.

3.5     Financial Statements, Books and Records. Attached as Schedule 3.5 are the financial statements (balance sheet, income statement, notes) of TCC, through December 31, 2002 (the "Financial Statements"). The books of account and other financial records of TCC are in all respects complete and correct in all material respects and are maintained in accordance with good business and accounting practices

3.6     No Material Adverse Changes. Since December 31, 2002 there has not been:

        (i)     any material adverse change in the financial position of the TCC, except changes arising in the ordinary course of business, which changes will in no event materially and adversely affect the financial position of any one of the companies;

        (ii)    any damage, destruction or loss materially affecting the assets, prospective business, operations or condition (financial or otherwise) of the companies, whether or not covered by insurance;

        (iii)   any declaration, setting aside or payment of any dividend or distribution with respect to any redemption or repurchase of capital interests with respect to each of the companies;

        (iv)    any sale of an asset (other than in the ordinary course of business) or any mortgage or pledge by TCC of any properties or assets belonging to the company; or

        (v)     adoption of any pension, profit sharing, retirement, stock bonus, stock option or similar plan or arrangement.

3.7     Taxes. TCC has filed all material tax, governmental and/or related forms and reports (or extensions thereof) due or required to be filed and has paid or made adequate provisions for all taxes or assessments which had become due as of the Closing Date, and there are no deficiency notices outstanding. No extensions of time for the assessment of deficiencies for any year is in effect. No deficiency notice is proposed or, after reasonable inquiry, threatened against TCC. The tax returns have never been audited.

3.8     Compliance with Laws. TCC has complied with all federal, state, county and local laws, ordinances, regulations, inspections, orders, judgments, injunctions, awards or decrees applicable to it or its business which, if not complied with, would materially and adversely affect the business of TCC.

3.9     No Breach. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not:

        (i) violate any provision of the Articles of Incorporation or the Bylaws of TCC;

(ii) violate, conflict with or result in the breach of any of the terms of, result in a material modification of, otherwise give any other contracting party the right to terminate, or constitute (or with notice or lapse of time, or both constitute) a default under any contract or other agreement to which TCC is a party or by or to which it or any of its assets or properties may be bound or subject;

(iii) violate any order, judgment, injunction, award or decree of any court, arbitrator or governmental or regulatory body against, or binding upon, TCC or upon the properties or business of TCC; or

(iv)    violate any statute, law or regulation of any jurisdiction applicable to the transactions contemplated herein which could have a material, adverse effect on the business or operations of TCC.

3.10    Actions and Proceedings. TCC is not a party to any material pending litigation or, to the knowledge of TCC, after reasonable inquiry, any governmental investigation or proceeding not reflected in the Financial Statements and no material litigation, claims, assessments or non-governmental proceedings are threatened against TCC except as set forth on Schedule 3.10 attached hereto and made a part hereof.

3.11    Agreements. Schedule 3.11 sets forth any material contract or arrangement to which TCC is a party or by or to which it or its assets, properties or business are bound or subject, whether written or oral.

3.12    Brokers or Finders. No broker's or finder's fee will be payable by TCC in connection with the transactions contemplated by this Agreement after Closing.

3.13    Real Estate. Except as set forth on Schedule 3.13, TCC owns no other real property nor is a party to any leasehold agreement. All uses of the real property by TCC conform in all material respects to all applicable building and zoning ordinances, laws and regulations.

TCC has been issued all required federal, state and local licenses, certificates or permits relating to all applicable environmental laws. There are no visible signs of releases, spills, discharges, leaks or disposal (collectively, referred to as "Releases") of hazardous substances at, upon, under or within the real property owned by TCC.

3.14    Tangible Assets. TCC, prior to Closing, has full title and interest in all machinery, equipment, furniture, leasehold improvements, fixtures, projects, owned or leased by TCC, and to any related capitalized items or other tangible property material to the business of the company (the "Tangible Assets"). Other than as set forth in Schedule 3.14, TCC holds all rights, title and interest in all the Tangible Assets owned by it on the Balance Sheet or acquired by it after the date on the Balance Sheet free and clear of all liens, pledges, mortgages, security interests, conditional sales contracts or any other

10

encumbrances. All of the Tangible Assets are in good operating condition and repair and are usable in the ordinary course of business and conform to all applicable laws, ordinances and government orders, rules and regulations relating to their construction and operation, except as set forth on Schedule 3.14 hereto. Except as set forth on Schedule 3.14, TCC, has clear title to all of its fictional business names, trading names, registered and unregistered trademarks, service marks and applications (collectively, the "Marks") and Marks are included as Tangible Assets.  The Tangible Assets include, but are not limited to, the telephone numbers, facsimile numbers and Internet domain names.

3.14.1 Mutual Use of True Colors Brand. TCC, post-closing, shall share the ownership of the True Colors brand (excluding the True Colors Classrunner mark, which is being transferred solely to ESI) with True Colors Studios. The True Colors brand shall include, but not be limited to, all trademarks, servicemarks and other intellectual property rights owned by TCC.  TCC and True Colors Studios shall have simultaneous and equal rights to the True Colors brand in all markets worldwide. TCC will have exclusive rights (shared only with True Colors Studios) to the True Colors brand with regard to electronic commerce on the Internet. No third party can be licensed the brand by True Colors Studios for use of the brand with regard to electronic commerce on the Internet.  True Colors Studios will have the exclusive rights (shared only with TCC) to the True Colors brand with regard to the entertainment industry.  No third party can be licensed the brand by TCC for use of the brand with regard to the entertainment industry.   With respect to the mutual use of the True Colors brand, TCC and True Colors Studios agree that they will maintain the quality control standards previously established by TCC and that they agree to make whatever remedial measures are reasonably requested by the other party to maintain such quality control standards.

3.15  Liabilities. TCC has no material direct or indirect indebtedness, liability, claim, loss, damage, deficiency, obligation or responsibility, known or unknown, fixed or unfixed, liquidated or unliquidated, secured or unsecured, accrued or absolute, contingent or otherwise, including, without limitation, any liability on account of taxes, any governmental charge or lawsuit (all of the foregoing collectively defined to as "Liabilities"), which are not fully, fairly and adequately reflected on the Financial Statements (annual and interim), except for any specific Liabilities set forth on Schedule 3.15 attached hereto and made a part hereof. As of the date of Closing, there will be no Liabilities, other than Liabilities fully and adequately reflected on the Financial Statements except for Liabilities incurred in the ordinary course of business and as set forth in Schedule 3.15.

3.16  Access to Records. The financial records, minute books and other documents and records of TCC have been made available to LBC prior to the Closing.

3.17  Operations of the Company. From the date of the Financial Statements through the date of Closing, TCC has not and will not, outside of the ordinary course of business, have:

11

(i)     incurred any indebtedness or borrowed money that is or will be charged against the company;

(ii)    declared or paid any dividend or declared or made any distribution of any kind, or made any direct or indirect redemption, retirement, purchase or other acquisition of any interests in its capital structure;

(iii)   made any loan or advance from TCC, or any manager, member, officer, director, employee, consultant, agent or other representative or made any other loan or advance;

(iv)    disposed of any assets of the company;

(v)     materially increased the annual level of compensation of any executive employee of the company;

(vi)    increased, terminated, amended or otherwise modified any plan for the benefit of employees of the company;

(vii)   issued any equity securities or rights to acquire such equity securities with respect to the company; or

(viii)  entered into or modified any contract, agreement or transaction concerning the company.

3.18    Capitalization. The authorized capital of TCC is: 10,000 Shares.  As of January 1, 2004 there are 10,000 shares of TCC stock issued and outstanding.

3.19    Full Disclosure. No representation or warranty by TCC or in any document or schedule to be delivered by them pursuant hereto, and no written statement, certificate or instrument furnished or to be furnished by TCC pursuant hereto or in connection with the negotiation, execution or performance of this Agreement contains or will contain any untrue statement of a material fact or omits or will omit to state any fact necessary to make any statement herein or therein not materially misleading or necessary to a complete and correct presentation of all material aspects of the business of TCC.

## SECTION 4. CONDITIONS PRECEDENT

4.1     Conditions Precedent to the Obligation of LBC. All obligations of LBC under this Agreement are subject to the fulfillment, prior to or as of the Closing Date, as indicated below, of each of the following conditions:

12

    (a)    The representations and warranties by or on behalf of TCC contained in this Agreement or in any certificate or document delivered pursuant to the provisions hereof shall be true in all material respects at and as of Closing Date as though such representations and warranties were made at and as of such time.

    (b)    TCC shall have performed and complied in all material respects, with all covenants, agreements, and conditions set forth in, and shall have executed and delivered all documents required by this Agreement to be performed or complied with or executed and delivered by them prior to or at the Closing.

    (c)    All instruments and documents delivered to LBC pursuant to provisions hereof shall be reasonably satisfactory to legal counsel for LBC.

    (d)    ESI will have agreed to accept 200,000 shares of LBC common stock in total satisfaction of ESI's $400,000 loan to TCC.

    (e)    Don and Erica will have agreed to enter into the Consulting Agreements.

    4.2    <u>Conditions Precedent to the Obligations of TCC.</u> All obligations of TCC under this Agreement are subject to the fulfillment, prior to or at Closing, of each of the following conditions:

    (a)    The representations and warranties by LBC contained in this Agreement or in any certificate or document delivered pursuant to the provisions hereof shall be true in all material respects at and as of the Closing Date as though such representations and warranties were made at and as of such time.

    (b)    LBC shall have performed and complied with, in all material respects, with all covenants, agreements, and conditions set forth in, and shall have executed and delivered all documents required by this Agreement to be performed or complied or executed and delivered by them prior to or at the Closing.

    (c)    All instruments and documents delivered to TCC pursuant to provisions hereof shall be reasonably satisfactory to legal counsel to TCC.

    (d)    LBC will have agreed to issue to ESI 200,000 shares of LBC in total satisfaction of ESI's $400,000 loan to TCC.

13

(e)     LBC will have agreed, on behalf of TCC post-closing, to the royalty structure for payments due Erica and the Gross Receipts Agreement for Don.

(f)     LBC will have agreed, on behalf of TCC, to the post-closing Joint Venture Agreements with True Colors Studios and with ESI.

(g)     LBC will have agreed, on behalf of TCC, to the post-closing transfer of ownership of the True Colors Classrunner mark to ESI.

(h)     LBC will have agreed, on behalf of TCC, to the post-closing transfer of co-ownership of the True Colors brand (excluding the True Colors Classrunner mark which is being transferred solely to ESI) to True Colors Studios.

(i)     LBC will have agreed, on behalf of TCC to the post-closing ownership of the Furniture and Equipment.

14

## SECTION 5. COVENANTS

5.1     Corporate Examinations and Investigations. Prior to the Closing Date, the parties acknowledge that they have been entitled, through their employees and representatives, to make such investigation of the assets, properties, business and operations, books, records and financial condition of the other as they each may reasonably require. No investigations, by a party hereto shall, however, diminish or waive any of the representations, warranties, covenants or agreements of the party under this Agreement.

5.2     Further Assurances. The parties shall execute such documents and other papers and take such further actions as may be reasonably required or desirable to carry out the provisions hereof and the transactions contemplated hereby. Each such party shall use its best efforts to fulfill or obtain the fulfillment of the conditions to the Closing, including, without limitation, the execution and delivery of any documents or other papers, the execution and delivery of which are necessary or appropriate to the Closing.

5.3     Confidentiality. In the event the transactions contemplated by this Agreement are not consummated, TCC and LBC agree to keep confidential any information disclosed to each other in connection therewith for a period of one (1) year from the date hereof; provided, however, such obligation shall not apply to information which:

(i)     at the time of the disclosure was public knowledge;

(ii)     after the time of disclosure becomes public knowledge (except due to the action of the receiving party); or

(iii)     the receiving party had within its possession at the time of disclosure; or

(iv)     is ordered disclosed by a Court of proper jurisdiction.

## SECTION 6. SURVIVAL OF REPRESENTATIONS AND WARRANTIES

Notwithstanding any right of either party to investigate the affairs of the other party, each party has the right to rely fully upon representations, warranties, covenants and agreements of the other party contained in this Agreement or in any document delivered to one by the other or any of their representatives, in connection with the transactions contemplated by this Agreement. All such representations, warranties, covenants and agreements shall survive the execution and delivery hereof and the closing hereunder for one year following the Closing.

15

## SECTION 7. INDEMNIFICATION

For a period of one (1) year from the Closing, Owners agree to indemnify and hold harmless LBC, its officers, directors and principal shareholders, and LBC agrees to indemnify and hold harmless Owners, at all times up to one (1) year after the date of this Agreement against and in respect of any liability, damage, or deficiency, all actions, suits, proceedings, demands, assessments, judgments, costs and expenses, including attorneys' fees, incident to any of the foregoing, resulting from any material misrepresentation made by any indemnifying party to an indemnified party, an indemnifying party's breach of a covenant or warranty or an indemnifying party's nonfulfillment of any agreement hereunder, or from any material misrepresentation or omission from any certificate, financial statement or tax return furnished or to be furnished hereunder for any period up to and including 120 days after execution of this Agreement.

If the indemnified party receives written notice of the commencement of any legal action, suit or proceeding with respect to which the indemnifying party is or may be obligated to provide indemnification pursuant to this Section, the indemnified party shall, within 30 days of the receipt of such written notice, give the indemnifying party written notice thereof (a "Claim Notice"). Failure to give such Claim Notice within such 30 day period shall not constitute a waiver by the indemnified party or its rights to indemnity hereunder with respect to such action, suit or proceeding unless the defense thereof is prejudiced thereby. Upon receipt by the indemnifying party of a Claim Notice from the indemnified party with respect to any claim for indemnification which is based upon a claim made by a third party ("Third Party Claim"), the indemnifying party may assume the defense of the Third Party Claim with counsel of its own choosing, as described below. The indemnified party shall cooperate in the defense of the Third Party Claim and shall furnish such records, information and testimony and attend all such conferences, discovery proceedings, hearings, trials and appeals as may be reasonably required in connection therewith. The indemnified party shall have the right to employ its own counsel in any such action, but the fees and expenses of such counsel shall be at the expense of the indemnified party unless the indemnifying party shall not have with reasonable promptness employed counsel to assume the defense of the Third Party Claim, in which event such fees and expenses shall be borne solely by the indemnifying party. The indemnifying party shall not satisfy or settle any Third Party Claim for which indemnification has been sought and is available hereunder, without the prior written consent of the indemnified party, which consent shall not be delayed or which shall not be required if the indemnified party is granted a release in connection therewith. If the indemnifying party shall fail with reasonable promptness to defend such Third Party Claim, the indemnified party may defend, satisfy or settle the Third Party Claim at the expense of the indemnifying party and the indemnifying party shall pay to the indemnified party the amount of such Loss within ten days after written demand thereof. The indemnification provisions hereof shall survive the termination of this Agreement.

## SECTION 8. DOCUMENTS AT CLOSING AND THE CLOSING

8.1    <u>Documents at Closing</u>. At the Closing the following transactions shall occur, all of such transactions being deemed to occur simultaneously:

(a)    LBC will deliver, or will cause to be delivered, to TCC and/or Owners the following:

     (i) A certificate that all representations and warranties made by LBC under this Agreement are true and correct as of the Closing Date, the same as though originally given to TCC on said date;

     (ii)    A certificate from the relevant Nevada authority dated at or about the Closing Date to the effect that LBC is in good standing under the laws of said jurisdiction;

     (iii)    A resolution of the Board of Directors authorizing this transaction;

     (iv)    Certificates representing the LBC Shares to be transferred to Owners;

     (v)    Certificates for 200,000 shares of LBC stock to be transferred to ESI;

     (vi)    The Consulting Agreements executed by LBC on behalf of post closing TCC;

     (vii)    The Joint Venture Agreements executed by LBC on behalf of post closing TCC;

     (viii)    The Gross Receipts Agreement executed by LBC on behalf of post closing TCC;

     (ix)    All other items as provided in this Agreement.

(b)    TCC and/or Owners will deliver or cause to be delivered to LBC:

     (i)    A certificate executed by TCC to the effect that all representations and warranties of TCC made under this Agreement are true and correct as of the Closing;

     (ii)    A certificate from the relevant California authority dated at or about the Closing to the effect that TCC is in good standing under the laws of said jurisdiction;

17

(iii)    Certificates representing the TCC Shares to be transferred to LBC;

(iv)    The Consulting Agreements executed by Don and Erica;

(v)    The Joint Venture Agreements executed by True Colors Studios and ESI;

(vi)    The Gross Receipts Agreement executed by Don;

(vii)    All other items as provided in this Agreement.

8.2    The Closing. The Closing shall take place at the time or place as may be agreed upon by the parties hereto, after all pre-conditions have been met. At the Closing, the parties shall provide each other with such documents as may be necessary. In no event however shall the Closing occur after March 31, 2004. If the transactions contemplated herein have not closed on or before such date this Agreement shall be terminated.

## SECTION 9. MISCELLANEOUS

9. 1    <u>Waivers.</u> The waiver of a breach of this Agreement or the failure of any party hereto to exercise any right under this Agreement shall in no way constitute waiver as to future breach whether similar or dissimilar in nature or as to the exercise of any further right under this Agreement.

9.2    <u>Amendment.</u> This Agreement may be amended or modified only by an instrument of equal formality signed by the parties or the duly authorized representatives of the respective parties.

9.3    <u>Assignment.</u> This Agreement is not assignable except by operation of law.

9.4    <u>Notice.</u> Until otherwise specified in writing, the mailing addresses and fax numbers of the parties of this Agreement shall be as follows:

> To: TCC:
>> Don Lowry
>> 2825 Laguna Canyon Road
>> Laguna Beach, CA 92651

> To: LBC Global:
>> Doug Mondo
>> 3605 W. MacArthur Blvd., Suite 702
>> Santa Ana, CA 92704

> With Copy To:
>> Christopher Dieterich
>> Dieterich & Associates
>> 11300 West Olympic Boulevard, Suite 800
>> Los Angeles, California 90064
>> Fax: (310) 312-6680

Any notice or statement given under this Agreement shall be deemed to have been given if sent by registered mail addressed to the other party at the address indicated above or at such other address which shall have been furnished in writing to the addressor.

9.5    <u>Governing Law.</u> This Agreement shall be construed, and the legal relations between the parties determined, in accordance with the laws of the California, thereby precluding any choice of law rules which may direct the application of the laws of any other jurisdiction.

9.6    <u>Publicity.</u> No publicity release or announcement concerning this Agreement or the transactions contemplated hereby shall be issued by either party hereto at any time

from the signing hereof without advance approval in writing of the form and substance by the other party.

9.7     Entire Agreement. This Agreement (including the Exhibits and Schedules to be attached hereto) and the collateral agreements executed in connection with the consummation of the transactions contemplated herein contain the entire agreement among the parties with respect to the exchange and issuance of the Shares and related transactions, and supersede all prior agreements, written or oral, with respect thereto.

9.8     Headings. The headings in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

9.9     Severability of Provisions. The invalidity or unenforceability of any term, phrase, clause, paragraph, restriction, covenant, agreement or provision of this Agreement shall in no way affect the validity or enforcement of any other provision or any part thereof.

9.10    Counterparts. This Agreement may be executed in any number of counterparts, each of which when so executed, shall constitute an original copy hereof, but all of which together shall consider but one and the same document.

9.11    Binding Effect. This Agreement shall be binding upon the parties hereto and inure to the benefit of the parties, their respective heirs, administrators, executors, successors and assigns.

9.12    Tax Treatment. TCC, Owners and LBC acknowledge that they each have been represented by their own tax advisors in connection with this transaction; that none of them has made a representation or warranty to any of the other parties with respect to the tax treatment accorded this transaction, or the effect individually or corporately on any party under the applicable tax laws, regulations, or interpretations; and that no opinion of counsel or private revenue ruling has been obtained with respect to the effects of this transaction under the Internal Revenue Code.

9.13    Press Releases. The parties will mutually agree as to the wording and timing of any informational releases concerning this transaction prior to and through Closing.

9.14    Expenses. Each party will bear its own expenses preceding and following Closing with respect to the actual exchange transaction, all appraisals and audits of TCC and any other expense attributable to this transaction, including normal legal, accounting and government reporting obligations of LBC that occur during the pendency of this transaction.

9.15    Attorneys' Fees. In the event of any controversy or dispute arising out of this Agreement, the prevailing party or parties shall be entitled to recover from the non-

prevailing party or parties, reasonable expenses, including, without limitation, attorneys' fees and costs actually incurred.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

True Colors, Inc
a California corporation

By: _____
Don Lowry,
President

LBC Global, Inc.,
a Nevada corporation

By: _____
Doug Mondo,
President

_____
Don Lowry

_____
Erica Echols Lowry

21

# SCHEDULES

## LBC Schedules

1.51   Qualified Floor
The 750,000 shares to be issued to Owners will be guaranteed by LBC to have a market value of at least $2.00 per share, as measured by the 10-Day average trading price of the stock at a date that is one year from the Closing Date of this Agreement. At that time, should the value of the Shares be less than $2.00 per share, additional shares will be issued, utilizing the 10-day average trading price prior to the measurement date, such that the aggregate value of newly-issued shares plus the 750,000 original shares will be $1,500,000.

2.4   Consents: NONE

2.5   Company Financial Statements:  Available at LBC Global

2.10   Claims, Litigation, Government actions pending: NONE

2.11   Significant contracts: Stock purchase agreement and related contracts with Video Central, LLC available at LBC Global

2.13   Real Estate:  NONE

2.14   List of exceptions to the Tangible Assets on balance sheets: NONE

2.15   List of undisclosed Liabilities: NONE

## TCC Schedules

3.4   Consents: NONE

3.5   Company Financial Statements: Available at TCC

3.10   Claims, Litigation, Government actions pending: Labor dispute claim involving John McNichols. Maximum exposure is thought to be $16,500. Documents Available at TCC

3.11   Significant contracts: Available at TCC

3.13   Real Estate:  NONE

3.14   List of exceptions to the Tangible Assets on balance sheets: Unchallenged infringements against the True Colors brand.

22

3.14   List of undisclosed Liabilities:

    (a) $45,000 debt to John Butler, $45,000 debt to American Express, $111,000 debt to the ESI Pension Plan, $36,000 debt to Don Lowry, and $25,000 debt to Don Lowry's credit line at Bank of America.

    (b) Unchallenged infringements against the True Colors brand.

# FIRST AMENDMENT
# TO
# STOCK PURCHASE AGREEMENT

This First Amendment to Stock Purchase Agreement ("Amendment") is entered into as of March 31, 2004, by and between LBC Global, Inc. ("Buyer", "LBC", or "LBC Global"), a Nevada corporation, True Colors, Inc., a California corporation, dba True Colors Communications ("Seller" or "TCC"), and Don Lowry ("Don") and Erica Echols Lowry ("Erica"), the shareholders of TCC (collectively, "Owners") and amends that certain Stock Purchase Agreement effective as of January 1, 2004 (the "Agreement").

For valuable consideration, the parties agree as follows:

1.      The requirements provided in Section 8, Paragraph 8.1 (a) (i), (ii) and (iii) and Paragraph 8.1 (b) (i) and (ii) of the Agreement are hereby waived.

2.      Except as provided in this Amendment, all other provisions of the Agreement are hereby ratified.

In witness whereof, the parties have entered into this Amendment effective as of the date first written above.

True Colors, Inc.,
a California corporation


By:_____
      Don Lowry,
      President

LBC Global, Inc.,
a Nevada corporation

By: _____
      Doug Mondo,
      President


_____

Don Lowry


_____

Erica Echols Lowry

**EXHIBIT 2**

# JOINT VENTURE AGREEMENT

This Joint Venture Agreement (the "Agreement") is effective as of the 1st day of January 2004, by and between True Colors, Inc., a California corporation, dba True Colors Communications (hereinafter "TCC") and Don Lowry, doing business as True Colors Studios (hereinafter "TC Studios").

## Background Statements

Whereas TCC is currently in the business of providing educational and corporate training materials.

Whereas TC Studios is currently involved with the presentation of education in the medium of entertainment; and

Whereas TCC is looking to sell its product and services to TC Studios clients; and

Whereas TC Studios is looking to sell its products and services to TCC clients; and

Whereas TCC and TC Studios wish to substantially increase the amount of business that they currently handle and both parties feel this Agreement will help facilitate this mutual goal; and

The Parties desire to form a joint venture to pursue the business.

NOW THEREFORE, for valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## PURPOSE OF JOINT VENTURE

The purpose of this Joint Venture is to facilitate a joint marketing and reseller / distribution relationship in an effort to increase revenues and lower overhead expenses in a mutually beneficial manner.

## ARTICLE II
## TERMS

### TCC PRODUCTS AND SERVICES
TCC will provide TC Studios a commission of 30% on all TCC products and services sold by TC Studios. The commission will be based on retail pricing of the products and services and will be paid to TC Studios within 30 days of the receipt of funds for each transaction.

### TC STUDIOS PRODUCTS AND SERVICES
TC Studios will provide TCC a commission of 30% on all TC Studios products and services sold by TCC. The commission will be based on retail pricing of the products and services and will be paid to TCC within 30 days of the receipt of funds for each transaction.

1

## PRIMARY PRODUCTION PARTNER

TC Studios will be the primary production partner for TCC video and DVD production of future True Colors products and services. A co-production partnership will be negotiated on a per production basis. The parties will use reasonable means to negotiate such production partnerships. If, however, the parties are unable to negotiate a partnership for a particular production, the parties agree that TCC may not use another production partner with a compensation plan that is, in general, equal to or greater than the compensation plan requested by TC Studios for essentially the same partnership responsibilities offered by TC Studios.

## TCC AND TC STUDIOS JOINT MARKETING

TCC will partner with TC Studios on promotional events to increase the demand for all of the True Colors programs, products and services. The structure of this partnering will be negotiated on a per promotion basis. The parties will use reasonable means to negotiate such promotional partnerships. If, however, the parties are unable to negotiate a partnership for a particular promotion, the parties agree that TCC may not use another promotional partner with a compensation plan that is, in general, equal to or greater than the compensation plan requested by TC Studios for essentially the same partnership responsibilities offered by TC Studios.

TC Studios will include TCC programs, products and services in its general catalog for everyone's benefit, as reasonably approved by TCC.

## OVERHEAD EXPENSE SHARING

TCC is the principle tenant of the business office located at 2825 Laguna Canyon Road, Laguna Beach, CA 92651 (Buildings A and B) (the "Property"). TC Studios will sublease 115 square feet of Building A and will also sublease all 930 square feet in Building B.

The sublease will be for 5 years and have an escalating rent structure as follows:

| Year One | $1,202.00 /mo |
| Year Two | $1,254.00 /mo |
| Year Three | $1,359.00 /mo |
| Year Four | $1,463.00 /mo |
| Year Five | $1,516.00 /mo |

TC Studios will also pay with each month's rent an estimated cost of utilities of $260.00 and common area maintenance (CAM) fee of $120.00.

TC Studios will also pay 30% of the cost associated with a receptionist's salary and benefits. In return TC Studios will have full access to the service of the receptionist and will also have access to all common areas and conference facilities in Building A.

TC Studios will set a rental rate for Building B that it will charge to TCC for use of the facility for TCC university classes and training events.

Notwithstanding anything else contained herein, for the first twelve (12) months of this Agreement, or until January 1, 2004, all Overhead Expense Sharing shall be waived as to TC Studios.

In addition, notwithstanding that TCC is the principle tenant of the Property, the parties agree that TC Studios may create a substantial TC Studios identity at the Property.

## ARTICLE III
## MISCELLANEOUS

**Term:** This Agreement shall continue in full force and effect for five years from the date of this Agreement.

**Liability:** Each Party acknowledges that it shall be responsible for any loss, cost, damage, claim or other charge that arises out of or is caused by the actions of that Party or its employees or agents. No Party shall be liable for any loss, cost, damage, claim or other charge that arises out of or is caused by the actions of the other Party or its employees or agents. Joint and several liability will not attach to the Parties; no Party is responsible for the actions of the other Party. The Parties agree that in no event will consequential or punitive damages be applicable or awarded with respect to any dispute that may arise between or among the Parties in connection with this Agreement.

**Insurance:** Each Party agrees to obtain and maintain appropriate public liability and casualty insurance, or adequate levels of self insurance, to insure against any liability caused by that Party's obligations under this Agreement.

**Notices:** Any notice or request with reference to this Agreement shall be made by first class mail postage prepaid, telex, or facsimile to the following individuals:

| If to TCC: | True Colors, Inc. |
| | 2825 Laguna Canyon Road |
| | Laguna Beach, CA 92651. |

| If to TC Studios: | True Colors Studios |
| | 2825 Laguna Canyon Road |
| | Laguna Beach, CA 92651. |

**Amendments:** No amendment or modification of this Agreement shall be valid unless made in writing and signed by all parties.

**Assignment:** This Agreement shall not be assigned by any Party without the express written consent of the other Party, which consent may be unreasonably withheld. Notwithstanding the above, TC Studios may assign this Agreement to a business entity owned primarily by Don Lowry.

**Force Majeure:** No Party shall be liable, with respect to any delay in completion of work hereunder or of the non-performance of any term or condition of this Agreement directly or indirectly resulting from delays by Acts of God; acts of the public enemy; strikes; lockouts; epidemic and riots; power failure; water shortage or adverse weather conditions; or other causes beyond the control of the Parties. In the event of any of the foregoing, the time for performance shall be equitably and immediately adjusted, and in no event shall any Party be liable for any consequential or incidental damages from its performance or non-performance of any term or

3

condition of this Agreement.   The Parties shall resume the completion of work under this Agreement as soon as possible subsequent to any delay due to force majeure.

<u>Severability</u>:  If any provision of this Agreement is declared invalid by any court or government agency, all other provisions shall remain in full force and effect.

<u>Use of Names</u>:  No Party shall use in any advertising, promotional or sales literature the name of any other Party without prior written consent.

<u>Waivers</u>:  Waiver by any Party of any breach or failure to comply with any provision of this Agreement by another Party shall not be construed as, or constitute, a continuing waiver of such provision or a waiver of any other breach of or failure to comply with any other provision of this Agreement.

<u>Governing Law</u>:  This Agreement shall be governed by and interpreted in accordance with the laws of California.

<u>Interest Rate</u>:   Any sums not paid when due hereunder shall accrue interest at ten percent per annum.

<u>Attorneys' Fees</u>:  In the event of any controversy or dispute arising out of this Agreement, the prevailing party or parties shall be entitled to recover from the non-prevailing party or parties, reasonable expenses, including, without limitation, attorneys' fees and costs actually incurred.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement effective as of the date first written above.

True Colors, Inc.
A wholly owned subsidiary of LBC Global, Inc.


By: _____
Name: Doug Mondo
Title:  President and CEO of LBC Global, Inc.


True Colors Studios

By: _____
       Don Lowry

4

**EXHIBIT 3**

# GROSS RECEIPTS AGREEMENT

Agreement effective as of January 1, 2004, by and between True Colors, Inc., 12395 Doherty Street, Riverside, CA 92503 ("TCC") and Don Lowry, 2825 Laguna Canyon Road, Laguna Beach, CA 92651 ("Lowry").

In connection with the execution of that certain Stock Purchase Agreement dated as of January 1, 2004 by and between LBC Global, Inc., TCC, Lowry and Erica Echols Lowry and in consideration of the mutual covenants contained herein, the parties agree as follows:

## 1   FEE

a.  TCC will pay Lowry a fee of one and one-half percent (1 ½%) of the gross receipts of TCC, less returns and any interest or investment income.  The gross receipts of TCC shall include the gross receipts of any affiliates of TCC to the extent such receipts are from products or services involving the True Colors brand.   To the extent that TCC may license the True Colors brand, any such licensing agreement shall include the one and one-half percent (1 ½%) gross receipts fee to Lowry.  The fee will be paid monthly (on or before the 20th of each month for the month ninety days prior for that month's receipts).  Any sums not paid when due shall accrue interest at ten percent per annum.

b.  Each statement sent by TCC with the fee payment will be final and binding upon Lowry three years after the date rendered, unless before the end of such period Lowry delivers to TCC specific written objection to the statement.  Lowry shall have the right to audit through a certified public accountant TCC's books with respect to any statement not deemed final and binding hereunder, such audit to be at a time mutually convenient to Lowry and TCC and at the expense of Lowry.  Should the audit reveal discrepancies or errors in the statement in excess of five percent (5%), TCC shall pay for the cost of the audit in addition to money owed Lowry and then due but unpaid.

## 2   SURVIVOR'S INTEREST IN LOWRY'S RIGHTS

In the event of the death of Lowry, TCC, upon proper notification, will pay all fees that may accrue to Lowry to Lowry's primary beneficiary, which Lowry has designated to be Erica Echols Lowry.  This designation of beneficiary and instruction for payment of royalty benefits shall remain in effect until altered or changed by Lowry.  Upon the death of the primary beneficiary, if no successor beneficiary is named, all fees that may accrue to Lowry shall be made to Lowry's estate.

## 3   GENERAL

a.  This agreement will be construed in accordance with, and governed by, the laws of the State of California as applied to contracts that are executed and performed entirely in California.  Any litigation that is commenced to enforce the terms of this agreement shall be brought in Orange County, California.

b.  If any legal action, arbitration, or other proceeding is brought for the enforcement of this agreement, or because of an alleged dispute, breach, or default, in connection with any of the provisions of this agreement, the successful or prevailing party or parties will be entitled to

to any other relief to which they may be entitled.

c.  This agreement, and all attachments hereto, constitute the entire agreement between the parties pertaining to the subject matter contained in them and supersede all prior and contemporaneous agreements, representations, and understandings of the parties.  Lowry is not relying on any oral and/or written representations that are not included in this agreement.   No supplement, modification, or amendment of this agreement will be binding unless executed in writing by all the parties.   No waiver of any of the provisions of this agreement will be considered, or will constitute, a waiver of any other provision, and no waiver will constitute a continuing waiver.  No waiver will be binding unless executed in writing by the party making the waiver.  If any provision of this agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable.  If a court finds that any provision of this agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

d.  This agreement may be executed simultaneously in one or more counterparts, each of which will be considered an original, but all of which together will constitute one and the same instrument.

True Colors, Inc.
A wholly owned subsidiary of LBC Global, Inc.


By: _____
Name:  Doug Mondo
Title: President and CEO of LBC Global, Inc.


Don Lowry

2

**EXHIBIT 4**

# CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT ("AGREEMENT") is effective as of the 1st day of January 2004, and is made by and between Don Lowry (hereinafter referred to as "Don Lowry ", the consultant) and True Colors, Inc., DBA True Colors Communications (hereinafter referred to as "TCC", the client).

WHEREAS, TCC is desirous of obtaining education and training industry advice and other general business consulting services from Don Lowry;

WHEREAS, Don Lowry will incur substantial time and expense in connection with the fulfilling of its duties in accordance with the terms of this Agreement; and

WHEREAS, in consideration for Don Lowry agreeing to incur the time and expense of performing the services called for in this Agreement, TCC agrees to pay to Don Lowry and/or its designee(s) the considerations called for in this Agreement.

NOW, THEREFORE in consideration of the promises and the mutual covenants herein set forth, it is agreed as follows:

## AGREEMENT

## 1.  CONSULTING SERVICES

Don Lowry shall provide to TCC, when and as reasonably requested by TCC, from time to time, during normal business hours, business consultation services and advice concerning, but not limited to:

Consulting on the use of the True Colors education system in all markets that the consultant has expertise;

Consulting with respect to joint ventures and other strategic revenue generating partnerships;

Remaining as a member of the Board of Directors of TCC during the term of this Agreement; and

Running the day-to-day operations of TCC until May 1, 2004.

## 2.  TERM OF AGREEMENT

This Agreement shall become effective as of the date above written and shall continue until March 31, 2007 (the "Term"), at which time this Agreement shall automatically expire. The option to renew for one (1) successive one (1) year terms will be mutually explored at the end of the term.

## 3. SCOPE OF RETENTION

TCC hereby retains Don Lowry as a general business consultant and advisor during the Term of this Agreement. In the event TCC does not call upon Don Lowry for services during the Term of this Agreement, TCC shall remain liable to pay the fees and costs set forth in Sections 4 and 5.

## 4. INITIAL COMPENSATION

Upon entering into this Agreement, the Company shall pay Don Lowry a monthly consulting fee of $5000.00, payable on the first of each month.

## 5. ADDITIONAL COMPENSATION

In addition to the compensation set out above, Don Lowry shall receive compensation through the payment of certain business expenses for the duration of this contract. TCC will continue to make the payment on the Jeep currently driven by Don Lowry, or such other vehicle similar in cost chosen by Don Lowry. In addition TCC shall maintain auto insurance on said vehicle (as currently maintained) and make payment for said insurance.

## 6. INDEMNIFICATION

TCC agrees to indemnify and hold Don Lowry, True Colors Studios and all of its officers, directors, employees, affiliates and agents harmless from and against any and all manner of actions, causes of action, claims, demands, costs, damages, liabilities, losses, obligations and expenses (including actual attorneys' fees) arising or resulting from or related to Don Lowry 's performance of services under this Agreement.

## 7. REIMBURSEMENT OF REASONABLE COSTS

Don Lowry shall be reimbursed, within ten (10) days of presentation of a bill, with vouchers attached, by TCC for all reasonable and necessary out of pocket expenses, including travel and entertainment, incurred by Don Lowry in connection with the performance of his obligations hereunder. Any individual expense item over $100 must be pre approved by the President or designated officer of TCC.

## 8. INDEPENDENT CONTRACTOR

Don Lowry and TCC hereby acknowledge and agree Don Lowry is an independent contractor and is not a licensed broker/dealer. Don Lowry shall not hold itself out as, nor shall it take any action from which others might infer it is a partner or agent of, or in a joint venture with TCC. In addition, Don Lowry can take no action, which binds, or purports to bind TCC.

2

## 9. LAW FORUM

This Agreement shall be construed and interpreted in accordance with the laws of the State of California.   All disputes shall be subject to arbitration and be resolved according to the rules and regulations of the American Arbitration Association.

## 10. ATTORNEYS' FEES

In the event of any controversy or dispute arising out of this Agreement, the prevailing party or parties shall be entitled to recover from the non-prevailing party or parties, reasonable expenses, including, without limitation, attorneys' fees and costs actually incurred.

IN WITNESS WHEREOF, this Agreement is effective as of the date first written above.

Don Lowry

True Colors, Inc.
A wholly owned subsidiary of LBC Global, Inc.

By:

Name:  Doug Mondo

Title:   President and CEO of LBC Global, Inc.

3

**EXHIBIT 5**

# CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT ("AGREEMENT") is effective as of the 1st day of January 2004, and is made by and between Erica Echols Lowry. (hereinafter referred to as "Erica Echols Lowry", the consultant) and True Colors, Inc., DBA True Colors Communications (hereinafter referred to as "TCC", the client).

WHEREAS, TCC is desirous of obtaining education and training industry advice and other general business consulting services from Erica Echols Lowry;

WHEREAS, Erica Echols Lowry will incur substantial time and expense in connection with the fulfilling of its duties in accordance with the terms of this Agreement; and

WHEREAS, in consideration for Erica Echols Lowry agreeing to incur the time and expense of performing the services called for in this Agreement, TCC agrees to pay to Erica Echols Lowry and/or its designee(s) the considerations called for in this Agreement.

NOW, THEREFORE in consideration of the promises and the mutual covenants herein set forth, it is agreed as follows:

## AGREEMENT

## 1. CONSULTING SERVICES

Erica Echols Lowry shall provide to TCC, when and as reasonably requested by TCC, from time to time, during normal business hours, business consultation services and advice concerning, but not limited to:

Consulting on the use of the True Colors education system in all markets that the consultant has expertise;

Consulting with respect to joint ventures and other strategic revenue generating partnerships; and

Remaining as a member of the Board of Directors of TCC during the term of this Agreement.

## 2. TERM OF AGREEMENT

This Agreement shall become effective as of the date above written and shall continue until March 31, 2007 (the "Term"), at which time this Agreement shall automatically expire. The option to renew for one (1) successive one (1) year terms will be mutually explored at the end of the term.

## 3. SCOPE OF RETENTION

TCC hereby retains Erica Echols Lowry as a general business consultant and advisor during the Term of this Agreement. In the event TCC does not call upon Erica Echols Lowry for services during the Term of this Agreement, TCC shall remain liable to pay the fees and costs set forth in Sections 4 and 5.

1

## 4. INITIAL COMPENSATION

Upon entering into this Agreement, the Company shall pay Erica Echols Lowry a monthly consulting fee of $5000.00, payable on the first of each month.

## 5. ADDITIONAL COMPENSATION

In addition to the compensation set out above, Erica Echols Lowry shall receive compensation through the payment of certain business expenses for the duration of this contract. TCC will continue to make the payment on the Jaguar currently driven by Erica Echols Lowry. In addition TCC shall maintain auto insurance on said vehicle (as currently maintained) and make payment for said insurance.

## 6. INDEMNIFICATION

TCC agrees to indemnify and hold Erica Echols Lowry, True Colors Studios and all of its officers, directors, employees, affiliates and agents harmless from and against any and all manner of actions, causes of action, claims, demands, costs, damages, liabilities, losses, obligations and expenses (including actual attorneys' fees) arising or resulting from or related to Erica Echols Lowry 's performance of services under this Agreement.

## 7. REIMBURSEMENT OF REASONABLE COSTS

Erica Echols Lowry shall be reimbursed, within ten (10) days of presentation of a bill, with vouchers attached, by TCC for all reasonable and necessary out of pocket expenses, including travel and entertainment, incurred by Erica Echols Lowry in connection with the performance of her obligations hereunder. Any individual expense item over $100 must be pre approved by the President or designated officer of TCC.

## 8. INDEPENDENT CONTRACTOR

Erica Echols Lowry and TCC hereby acknowledge and agree Erica Echols Lowry is an independent contractor and is not a licensed broker/dealer. Erica Echols Lowry shall not hold itself out as, nor shall it take any action from which others might infer it is a partner or agent of, or in a joint venture with TCC. In addition, Erica Echols Lowry can take no action, which binds, or purports to bind TCC.

## 9. LAW FORUM

This Agreement shall be construed and interpreted in accordance with the laws of the State of California.   All disputes shall be subject to arbitration and be resolved according to the rules and regulations of the American Arbitration Association.

## 1.   ATTORNEYS' FEES

In the event of any controversy or dispute arising out of this Agreement, the prevailing party or parties shall be entitled to recover from the non-prevailing party or parties, reasonable expenses, including, without limitation, attorneys' fees and costs actually incurred.

IN WITNESS WHEREOF, this Agreement is effective as of the date first written above.

Erica Echols Lowry

True Colors, Inc.
A wholly owned subsidiary of LBC Global, Inc.


By:
Name:  Doug Mondo

Title:  President and CEO of LBC Global, Inc.

3

**EXHIBIT 6**

# DRAFT
## True Colors Communications Inc.—Royalty Agreements

| Product | Author | Author Royalty | True Colors Brand Royalty | Total Royalty |
|---|---|---|---|---|
| Keys to Personal Success | Don Lowry | TBD% | 1.5% | ?% |
| Keys to Successful Teaching | Don Lowry | TBD% | 1.5% | ?% |
| Keys to Successful Leadership | Don Lowry | TBD% | 1.5% | ?% |
| Keys to Successful Business Leadership | Don Lowry | TBD% | 1.5% | ?% |
| Keys to Personal Success Facilitator's Kit | Don Lowry | TBD% | 1.5% | ?% |
| True Colors Flash Cards | Don Lowry | TBD% | 1.5% | ?% |
| Keys to Successful Student Leadership | Don Lowry | TBD% | 1.5% | ?% |
| True Colors Character Cards (Sold individually) | Don Lowry | TBD% | 1.5% | ?% |
| True Colors Stickers | Don Lowry | TBD% | 1.5% | ?% |
| Parenting Cards | Don Lowry | TBD% | 1.5% | ?% |
| Spanish Cards | Don Lowry | TBD% | 1.5% | ?% |

| | | TBD% | | ?% |
|---|---|---|---|---|
| Character Cards in other Foreign Languages | Don Lowry | | 1.5% | |
| Flying Your True Colors For True Success | Don Lowry Erica Echols Lowry | 7.5%/7.5% | 1.5% | 16.5% |
| Flying Your True Colors For True Success Instructor's Guide | I wrote this but what was published something someone else wrote, will find out who | ?% | 1.5% | ?% |
| Showing our True Colors | Mary Miscisin | 17.5% (Incl. 2.5% to Cliff Gillies) | 1.5% | 19% |
| Follow Your True Colors To the Work You Love | Carolyn Kalil Don Lowry | 20% 8% | 1.5% | 29.5% |
| True Success in a Career | Carolyn Kalil/ Carol Imai | 15%/10% | 1.5% | 26.5% |
| Follow Your True Colors To the Work You Love— The Workbook | Carolyn Kalil/ Carol Imai | 15%/5% | 1.5% | 21.5% |
| Meaningful Conversations: Connecting the Dot and True Colors | Ann Kashiwa | 17.5% (Incl. 2.5% to Cliff Gillies) | 3% | 20.5% |
| Peaceful Colors | Gail Shapiro | 15% | 1.5% | 16.5% |

3

| Product | Person(s) | Rate | | Total |
|---|---|---|---|---|
| True Parenting | Kathleen Hayward<br>Cliff Gillies | 15%<br>2.5% | 1.5% | 19% |
| Reading Colors Program<br>Dare to Dream | Erica Echols Lowry<br>Curt Marsh | 15%<br>50% (He paid to publish) | 1.5%<br>1.5% | 16.5%<br>51.5% |
| The Colorbot Books | Erica Echols<br>And Sadie Echols | 15% | 1.5% | 16.5% |
| The Colorbot Book<br>Teacher's & Parent's Guide | Erica Echols | 15% | 1.5% | 16.5% |
| Reading Colors<br>Teacher's Guide & Lesson Planner | Jean Marie Miscisin | 17.5%<br>(Incl. 2.5% to E.E. Lowry) | 1.5% | 19% |
| Flying Your True Colors:<br>Foundations in Teaching | Erica Echols<br>Lowry | 5% of accredited course price minus cost of credit,<br>OR 15% if sold sep. as a product | 1.5% | 7.5%/<br>16.5% |
| True Colors Class Management<br>And Lesson Planning | Erica Echols<br>Lowry | 5% of accredited course price minus cost of credit<br>OR 15% if sold sep. as a product | 1.5% | 7.5%<br>16.5% |
| Showing Our True Colors—<br>The Workbook | Erica Echols Lowry<br>Don Lowry | 7.5%/7.5% | 1.5% | 16.5% |
| Corporate Video Series<br>And Workbooks | Bill Hillier<br>(to Meri Hillier—this will be negotiable) | 25% | 1.5% | 26.5% |

4

| | | | |
|---|---|---|---|
| The Coloring Game<br>(This is a discontinued product, because there's no coloring and no game.) | Robert Denning | 5% | 6.5% |
| Holiday Colors Facilitator's Guide | Erica Echols Lowry | 15% | 1.5% | 16.5% |
| Holiday Colors Participant Kit | Erica Echols Lowry | 15% | 1.5% | 16.5% |

True Colors Class Management Software—No written agreement.  For the software itself (True Achievement) Harts Systems, Inc. receives 75% of any sale; for the full class package, Harts receives 50%.

In the Works or Completed, with Author Agreements:

| | | | |
|---|---|---|---|
| The Ideal Me<br>--Self Life-Coaching<br>With True Colors | Erica Echols Lowry | 15% | 1.5% | 16.5% |
| True Love/True Colors | Erica Echols Lowry | 15% | 1.5% | 16.5% |
| True Weight Management | Mary Miscisin | 7.5%/7.5% | 1.5% | 16.5% |
| True Love Masquerade<br>Facilitator's Guide<br>(For singles) | Erica Echols Lowry | 15% | 1.5% | 16.5% |



| | | | | |
|---|---|---|---|---|
| True Love Masquerade Participant Kit (For singles) | Erica Echols Lowry | 15% | 1.5% | 16.5% |
| The Alchemy of Love Facilitators Guide (For couples) | Erica Echols Lowry | 15% | 1.5% | 16.5% |
| The Alchemy of Love Participant Kit (For couples) | Erica Echols Lowry | 15% | 1.5% | 16.5% |
| Party Colors Kit | Erica Echols Lowry | 15% | 1.5%% | 16.5% |
| True Colors Universe Online Interactive Game | Erica Echols Lowry | TBD | 1.5% | TBD |
| True Colors in Leadership Co-pub. With Blanchard | Erica Echols Lowry Lael Goode | TBD | 1.5% | TBD |
| True Hues—More Fun with True Colors | Sadie Echols Erica Echols | 10%/5% | 1.5% | 16.5% |

5

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge R. Gary Klausner and the assigned discovery Magistrate Judge is Suzanne H. Segal.

The case number on all documents filed with the Court should read as follows:

## CV08- 2120 RGK (SSx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

---

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | **[ ] Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | **[ ] Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

---

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
Don Lowry and Erica Echols Lowry

**DEFENDANTS**
True Colors International, Inc., a Nevada corporation, True Colors, Inc., a California corporation, Iain Saul, Mitchell Mondo, Douglas Mondo, Greg Myers and Candice Campbell

**(b)** County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases):
Orange County, California

County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only):
Orange County, California

**(c)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Sean A. OKeefe, State Bar No. 122417
OKeefe & Associates Law Corporation, P.C.
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660   Phone 949.720.4165

Attorneys (If Known)

BY FAX

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No   ☑ **MONEY DEMANDED IN COMPLAINT: $** 300,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. § 78j(b) and 78t(a); Rule 10b-5 [17 C.F.R. 240.10b-5]; Section 9 of the Exchange Act [15 U.S.C. § 78i(a)(1)]

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☑ 850 Securities/Commodities /Exchange | | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed? ☑ No ☐ Yes

If yes, list case number(s):

**FOR OFFICE USE ONLY:**   Case Number:   **CV08-02120 RGK (SSx)**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**VIII(b). RELATED CASES:** Have any cases been previously filed that are related to the present case? ☑No   ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A.   Arise from the same or closely related transactions, happenings, or events; or

☐ B.   Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C.   For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D.   Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** List the California County, or State if other than California, in which EACH named plaintiff resides (Use an additional sheet if necessary)
☐ Check here if the U.S. government, its agencies or employees is a named plaintiff.
   Orange County

List the California County, or State if other than California, in which EACH named defendant resides. (Use an additional sheet if necessary).
☐   Check here if the U.S. government, its agencies or employees is a named defendant.
   Orange County, Los Angeles County, Santa Barbara County

List the California County, or State if other than California, in which EACH claim arose. (Use an additional sheet if necessary)
Note: In land condemnation cases, use the location of the tract of land involved.
   Orange County

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _____   Date   March 31, 2008

Notice to Counsel/Parties:   The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |